E-filing

**PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

Name    Walker.            Eugene        A.
     (Last)            (First)       (Initial)

Prisoner Number    C-55991

Institutional Address    Correctional Training Facility

P.O. Box 689, Soledad, CA 93960

**FILED**

MAY 1 5 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

EUGENE A. WALKER,

(Enter the full name of plaintiff in this action.)

vs.

BEN CURRY (Warden),

XXXXXXXXXXXXXXXX

_____

_____

_____

(Enter the full name of respondent(s) or jailor in this action)

CV 08 2482

Case No. MMC ____
(To be provided by the clerk of court)

**PETITION FOR A WRIT**
**OF HABEAS CORPUS**    (PR)

_____

<u>Read Comments Carefully Before Filling In</u>

<u>When and Where to File</u>

You should file in the Northern District if you were convicted and sentenced in one of these

counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

this district if you are challenging the manner in which your sentence is being executed, such as loss of

good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

If you are challenging your conviction or sentence and you were <u>not</u> convicted and sentenced in

one of the above-named fifteen counties, your petition will likely be transferred to the United States

District Court for the district in which the state court that convicted and sentenced you is located. If

you are challenging the execution of your sentence and you are not in prison in one of these counties,

your petition will likely be transferred to the district court for the district that includes the institution

where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS

1  <u>Who to Name as Respondent</u>

2      You must name the person in whose actual custody you are.  This usually means the Warden or

3  jailor.  Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced.  These are not proper

5  respondents.

6      If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10  <u>A.  INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

11      1.  What sentence are you challenging in this petition?

12          (a)  Name and location of court that imposed sentence (for example; Alameda

13              County Superior Court, Oakland):

14  Los Angeles County Superior Court        Los Angeles

15              Court                           Location

16          (b)  Case number, if known  A374018

17          (c)  Date and terms of sentence  11/1/1982 - 15 years to life

18          (d)  Are you now in custody serving this term?  (Custody means being in jail, on

19              parole or probation, etc.)  Yes  XX    No _____

20              Where?

21              Name of Institution:  Correctional Training Facility

22              Address:  P.O. Box 689, Soledad, CA 93960

23      2.  For what crime were you given this sentence?  (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known.  If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26  Second degree murder - P.C. sect. 187

27  _____

28  _____

PET. FOR WRIT OF HAB. CORPUS        - 1 -

3. Did you have any of the following?

  Arraignment:       Yes \_\_\_\_\_  No \_\_\_\_\_

  Preliminary Hearing:    Yes \_\_\_\_\_  No \_\_\_\_\_

  Motion to Suppress:    Yes \_\_\_\_\_  No \_\_\_\_\_

4. How did you plead?

  Guilty \_\_\_\_\_  Not Guilty \_\_\_\_\_  Nolo Contendere \_\_\_\_\_

  Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

  Jury \_\_\_\_\_  Judge alone\_\_\_\_\_  Judge alone on a transcript \_\_\_\_\_

6. Did you testify at your trial?    Yes \_\_\_\_\_  No \_\_\_\_\_

7. Did you have an attorney at the following proceedings:

  (a)  Arraignment    Yes \_\_\_\_\_  No \_\_\_\_\_

  (b)  Preliminary hearing  Yes \_\_\_\_\_  No \_\_\_\_\_

  (c)  Time of plea    Yes \_\_\_\_\_  No \_\_\_\_\_

  (d)  Trial      Yes \_\_\_\_\_  No \_\_\_\_\_

  (e)  Sentencing    Yes \_\_\_\_\_  No \_\_\_\_\_

  (f)  Appeal     Yes \_\_\_\_\_  No \_\_\_\_\_

  (g)  Other post-conviction proceeding  Yes \_\_\_\_\_  No \_\_\_\_\_

8. Did you appeal your conviction?  Yes \_\_\_\_\_  No \_\_\_\_\_

  (a)  If you did, to what court(s) did you appeal?

    Court of Appeal    Yes _____  No \_\_\_\_\_

    Year: _____  Result:_____

    Supreme Court of California  Yes _____  No \_\_\_\_\_

    Year: _____  Result:_____

    Any other court    Yes _____  No \_\_\_\_\_

    Year: _____  Result:_____

  (b)  If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS   - 2 -

| | | | | |
|---|---|---|---|---|
| 1 | | | petition? | Yes _____ No_____ |
| 2 | | (c) | Was there an opinion? | Yes _____ No_____ |
| 3 | | (d) | Did you seek permission to file a late appeal under Rule 31(a)? | |
| 4 | | | | Yes _____ No_____ |

5   If you did, give the name of the court and the result:

6   _____

7   _____

8   9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9   this conviction in any court, state or federal?   Yes __XX__ No_____

10   [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11   challenged the same conviction you are challenging now and if that petition was denied or dismissed

12   with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13   for an order authorizing the district court to consider this petition. You may not file a second or

14   subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15   U.S.C. §§ 2244(b).]

16   (a)   If you sought relief in any proceeding other than an appeal, answer the following

17   questions for each proceeding. Attach extra paper if you need more space.

18   I.   Name of Court: __Los Angeles County Superior Court__

19   Type of Proceeding: __Habeas corpus__

20   Grounds raised (Be brief but specific):

21   a.__SAME AS RAISED HEREIN__

22   b._____

23   c._____

24   d._____

25   Result: __Denied__   Date of Result __8/24/2007__

26   II.   Name of Court: __Calif. App. Ct., Second App. Dist.__

27   Type of Proceeding: __Habeas corpus__

28   Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS       - 3 -

1    a. __SAME AS RAISED HEREIN_____

2    b._____

3    c._____

4    d._____

5    Result: __Denied_____Date of Result: 12/21/2007

6    III.   Name of Court: __California Supreme Court_____

7           Type of Proceeding: __Petition for Review_____

8           Grounds raised (Be brief but specific):

9           a. __SAME AS RAISED HEREIN_____

10          b._____

11          c._____

12          d._____

13          Result: __Denied_____Date of Result: 3/12/2008

14   IV.    Name of Court: _____

15          Type of Proceeding: _____

16          Grounds raised (Be brief but specific):

17          a._____

18          b._____

19          c._____

20          d._____

21          Result: _____Date of Result: _____

22   (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                                  Yes XX____   No_____

24          Name and location of court: This Court, Case no. C 07-00544 MMC

25   B. GROUNDS FOR RELIEF

26          State briefly every reason that you believe you are being confined unlawfully.  Give facts to

27   support each claim.  For example, what legal right or privilege were you denied?  What happened?

28   Who made the error?  Avoid legal arguments with numerous case citations.  Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS         - 4 -

need more space.  Answer the same questions for each claim.

### Claim I

PETITIONER'S RIGHT TO DUE PROCESS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED WHEN THE BOARD OF PAROLE HEARINGS FOUND HIM UNSUITABLE FOR PAROLE A QUARTER OF A CENTURY AFTER THE COMMITMENT OFFENSE WHEN THERE IS NOT A SCINTILLA OF EVIDENCE THAT HE IS A <u>CURRENT</u> THREAT TO PUBLIC SAFETY.

---

## I N T R O D U C T I O N

Eugene Walker (hereafter Petitioner) has been imprisoned twenty-five (25) years on an indeterminate sentence of 15 years to life. Having satisfied the factual predicate, time, and the legal predicate, rehabilitation, his imprisonment is now in violation of the Due Process Clause of the United States Constitution.

### Supporting facts

On November 26, 1981 Petitioner, with three fellow gang members of the "V and E" street gang, beat and robbed four men who ran out of gas near the housing project of the "V and E" gang.  Jesus Garcia, one of the four assaulted and robbed, died of multiple stab wounds inflicted by one of the "V and E" gang members.  Petitioner was arrested on December 4, 1981, and has been in custody since.

Pursuant to the information filed in Superior Court, Los Angeles County, Case No. A374018 (EXHIBIT 1), Petitioner was charged with one count of murder in violation of Penal Code § 187.[1/]  Petitioner was also charged with the special allegation within the meaning of Penal Code Section 190.2(a)(17), murder being committed during the commission of a robbery.

---

1. All codes and regulations are California, unless otherwise noted. California Code of Regulations, Title 15, will be cited, Cal. Code Regs., tit. 15.

On September 28, 1982, with no special promises other than the
expectation of parole after punishment proportionate to second degree
murder, Petitioner pled "guilty" to murder "of the second degree,
as charged in Count 1 of the information" (EXHIBIT 2), and pled
"guilty" to robbery in violation of Penal Code § 211, being sentenced
to four years running concurrent to the sentence of 15 years to life
prescribed for the second degree murder, for which Petitioner was
sentenced pursuant to Penal Code § 190. A Probation Officer's Report
(hereafter POR) was prepared for sentencing (EXHIBIT 3).

Petitioner's minimum eligible parole date (MEPD) was established
to be July 24, 1990. Petitioner's initial parole suitability hearing
was held on February 21, 1990, followed by seven subsequent hearings.
The primary reason for being found unsuitable for parole in each
instance was the commitment offense and prior criminal history as
a juvenile.

For historical purposes, Petitioner's 2006 parole hearing, his
NINTH, starts in 2004 when his 2004 hearing was postponed for an
updated psychological evaluation (EXHIBIT 4, request). The Board
wanted one of their own forensic experts to explore the following:
(1) violence potential in the free community; (2) alcohol/drugs
relating to the commitment offense and ability to refrain from same
when released; (3) extent to which Petitioner has explored the
commitment offense and come to terms with the underlying causes;
(4) the need for further therapy programs while incarcerated; and
(5) the likelihood of Petitioner returning to gang involvement
(EXHIBIT 4, p. 2).

On July 16, 2004, a psychological evaluation was prepared by

- 6 -

Dr. Macomber (EXHIBIT 5), one of the Board's own forensic experts.

In reference to the Board's inquiry, it is Dr. Macomber expert

opinion, in reverse order (EXHIBIT 5, pp. 1-2):

"Inmate Walker's thinking is quite prosocial. Although in the past his thinking was criminally oriented, he has matured and grown a great deal. There is no longer any evidence of criminal thinking. In fact, he has an adversity towards individuals who demonstrate delinquent or criminal values.

"In considering the current diagnostic classifications that would be appropriate, it is evident that when this inmate was arrested at the age of 19, he certainly met the criteria of a history of conduct disorder, as well as antisocial behavior and thinking. However, he has gone through some serious, life-changing experiences while incarcerated. His thinking at this time is quite prosocial. He has feelings of empathy and concern towards others. As a result, there is no evidence of personality disorder or other psychopathology at this point in time.

"Inmate Walker participated at DVI in the Straight Life program from 1992 to 1995. His participation in this program was a life-changing experience for him. As a former street gang member, he was chosen to confront juvenile delinquents sent by the courts to this program. These juvenile delinquents were the same kind of delinquents inmate Walker was at that age. In talking to them, reasoning with them, and trying to confront their criminal thinking, he found himself looking at his own values that he held as a teenager. He also saw how clearly these values were destructive and dangerous. As a result, he matured and adopted counter-delinquent values, which he now firmly supports. He stated, 'I was a young punk that was caught up in peer pressure foolishness. Nothing positive comes out of these groups.

"....

"Inmate Walker was very successful in confronting these delinquent youths.... They had dropped out of their gangs, completed their GEDs, and were on their ways to a law-abiding life. This had a dramatic impact on inmate Walker. He plans on continuing to work with delinquent youths in the community when he is paroled. His enthusiasm for this project is sincere and genuine. He would be an excellent role model for this type of program."

   Dr. Macomber's conclusion on the Board's concern in this area

was, in his expert opinion, "After three hours' evaluation and an

in-depth investigation of his thinking, this writer is certain that

he will not return to gang involvement" (EXHIBIT 5, p. 3). Petitioner

believes that also answers the Board's concern of "the extent to

which the prisoner has explored the commitment offense and come to

terms with the underlying factors," which was addressed by Dr. Reed

- 7 -

in his 1999 forensic evaluation (EXHIBIT 6, p. 4 ["Inmate Walker
demonstrates insight into the commitment offense. Moreover, his
judgment in general and specifically in regards to the commitment
offense appear to be sound"]). Dr Reed also noted that Petitioner
was sixteen (16) years old when he involved himself in a street gang
(EXHIBIT 6, p. 4).

In response to the Board's concern for further therapy programs
while incarcerated, in is Dr. Macomber's expert opinion, "There is
no evidence of a thought disorder. There is no evidence of cognitive
impairment. There is no history of serious head injuries. His
judgment is intact. His self-awareness and insight were also good.
.... As a result, there is no evidence of personality disorder or
other psychopathology at this point in time." And, "There are no
mental or emotional problems in this case that would interfere with
a parole date at this time" (EXHIBIT 5, pp. 1; 3). Echoing Dr. Reeds
1999 clinical observation, concluding, "This man does not have a
mental health disorder which would necessitate treatment either during
his incarceration period or following parole" (EXHIBIT 6, p. 5).

In response to the Board's concern for Petitioner use of drugs
or alcohol, it was Dr. Macomber's expert opinion, "In considering
risk factors for this inmate, drugs and alcohol have never been a
problem in this case, and therefore do not pose a risk factor"
(EXHIBIT 5, p. 3), again echoing Dr. Reed's 1999 evaluation, "This
inmate's does not appear to have a significant drug or alcohol problem
and there are no recommendations in this area" (EXHIBIT 6, p. 5).

The most important concern by the Board, was Petitioner's _current_
violence potential in the free community. In Dr. Macomber's expert

- 8 -

opinion, under assessment of dangerousness (EXHIBIT 5, p. 3):

"Even though he is still living in an institution that has ongoing racial
conflicts and inmate altercations, he is deliberately avoiding any compromising
situations or negative associates that could result in problems. He shows great
maturity, introspection, and good judgment. As a result, his potential for
dangerous behavior in the institutional environment is definitely below average.

"In considering the dangerousness potential when released to parole, the same
comments are appropriate. This man does not pose a risk to the community. His
violence potential is no more than the average citizen in the community. In
fact, he has learned lessons that many citizens in the community have not learned.
Therefore, his potential for violence may be even less than the average citizen."

Dr. Macomber was echoing the expert opinion of Dr. Reed in his
1999 evaluation, concluding (EXHIBIT 6, p. 5): "If released to the
community his violence potential is considered to be no more than
the average citizen in the community. [¶] "There are no significant
risk factors which may be precursors to violence for this inmate."

The 2005 hearing for which the psychological evaluation was
prepared, although the Board approving of Dr. Macomber's forensic
evaluation, commenting: "Recent psychological report by Dr. Macomber
is an excellent psychological evaluation. It shows that you've made
progress, shows that your level of dangerousness...if you're released
to the community, he says then may be less than the average citizen
in the community. So certainly from that perspective it was a good
psychological evaluation" (EXHIBIT 7, decision, p. 3:6-15), Petitioner
was, however, found unsuitable for parole; the Board finding: "the
offense was carried out in an especially cruel and callous manner.
[] The offense was carried out in a dispassionate and calculated
manner. [] The offense was carried out in a manner that demonstrates
a total disregard for one's fellow man" (EXHIBIT 7, decision, p.
1:12-2:4). Underlying reasons given by the Board were Petitioner
having a prior criminal history; having an unstable social history,

- 9 -

that being associated with a street gang, and a brother being killed by gang activity" (EXHIBIT 7, decision, p. 2:17-3:4). In a talismatic incantation the Board made the following findings: "The Panel finds that you need to continue on the path that you are on. You need to continue to participate in positive kinds of programs, self-help programs, and other kinds of programs that will enable you to be able to discuss, understand, and cope with stressful situations in a nondestructive manner" (EXHIBIT 7, decision, p. 4:1-7).

With that history, that brings us up to the 2006 parole suitability hearing and decision at bench.

On July 13, 2006, Petitioner's NINTH parole suitability hearing was conducted by the Board of Parole Hearings (hereafter Board) (EXHIBIT 8).[2/] Petitioner's MEPD was affirmed to be July 24, 1990 (HT 1). The Board stated that they "had the opportunity to review your Central File and your prior transcript" telling Petitioner he "will be given the opportunity to correct or clarify the record" (HT 5:10-14). It was noted by Petitioner's counsel that this hearing was six months late (HT 8:21-9:1). Petitioner was sworn to tell "the truth and nothing but the truth" (HT 12:3-8).

The facts of the offense, taken from the POR, were read into the record (HT 12:15-17:4, incorporated herein by reference).[3/] In short, Petitioner and three fellow gang members beat and robbed four victims who happened to run out of gas near the housing projects

---

2. Parole hearing transcript (EXHIBIT 8) will be referred to as HT followed by page, and when necessary, line number, e.g. (HT 1:1).

3. In that only the commitment offense was the reason to deny parole, the offense is the primary focus of this writ, thus only the facts of the offense and facts related to Petitioner's current risk to public safety will be set forth and argued.

- 10 -

of the VNE gang. The victims were beat with a stick, kicked, and stabbed. One was shot at as he ran away. Petitioner admits his participation and using a stick to beat and intimidate the victims. Petitioner was not aware of any of the victims being stabbed or shot at. Petitioner accepted the version of events as read into the record (HT 17:11-15).

The Board was concerned about Petitioner's Central File's A12 form validating Petitioner as a continuing gang member, the last entry being January 13 (2006) (HT 31:10-25). Petitioner believes the only reason for such documentation is because he came into prison as a documented gang member, but vehemently denies any gang membership or affiliation since his imprisonment (HT 32:8-33:2).

Referring to Dr. Macomber's 2004 psychological evaluation, "It is certainly positive" (HT 40:5-6). The Board noted "there are no clinical personality or physical disorders. Axis 4, there's stress as a result of a life term incarceration and that is a standard diagnostic impression that's applied to all life prisoners and you have under Axis 5, current global assessment functioning score of 90. That's relative high. That's based on a scale of zero to a hundred" (HT 40:17-25).[4/] Petitioner's GAF score has remained consistent, being 90 in 1999 (EXHIBIT 6, p. 4).

The Board then noted that when Petitioner was first incarcerated that he was "young and immature, rebellious and impulsive"; which Petitioner agreed (HT 41:2-6).

_____

4. Global Assessment of Functioning (GAF Scale) is a scale to measure a person's psychological, social, and occupational functioning based on a global average. The score does not go from "zero to a hundred"; but from 1 to 90          with 90 being the highest attainable score. Petitioner scored 90.

In discussing Dr. Macomber's assessment of current dangerousness the doctor writes (HT 41:8-26):

"you've since shown a great deal of maturity in perception and good judgment and, as a result, you're potential for dangerous behavior in the institution is considered to be definitely below average. In considering the dangerousness potential when released on parole,...you do not pose a risk to the community. Your violence potential is no more than the average citizen in the community and, in fact, based on some of the lessons that you've learned, your potential for violence may be even less than the average citizen. And then under observations and recommendations, the doctor writes that there are no mental or emotional problems that would interfere with parole considerations at this time."

In that the Board overlooked some important observations by Dr. Macomber, Counsel for Petitioner brought to the Board's attention the fact Petitioner "has gone through some serious life changing experiences while incarcerated. His thinking at this time is prosocial. He has feelings of empathy and concern toward others. As a result there is no evidence of personality disorder or other psychopathology at this point in time" (HT 42:2-16). Counsel then read from Dr. Macomber's evaluation of Petitioner's participation in the Straight Life anti-gang program in which he was instrumental in helping turn lives around of teen-agers who were much like him at their age (HT 42:16-43:15).

When asked what makes Petitioner "a different person from the person who committed the crime" (HT 54:18-21), Petitioner answered, in short, in the past he "acted emotionally without thinking"; being "so young and immature that I didn't have the rationale to stop and think; however, that's what I've worked on since 19, at least since 1989" (HT 54:22-55:5). Petitioner went on to explain how he now has empathy for others and thinks things through rationally before he acts and no longer acts out of emotion (HT 55:8-56:1).

Petitioner explained that he was able to refrain from gang

- 12 -

involvement because of his realization that it was his "own lack of rationale, my own immaturity had led me to this point; that led me to this commitment offense...I was going to have to make a change and the only way to make changes was to show some consistency and not get involved with a gang (HT 58:22-59:6). Petitioner coming to this realization and beginning metamorphosis from gang member to citizen while still in county jail (HT 59:13-19).

A representative from the Los Angeles District Attorney's Office, although opposing parole, acknowledged Petitioner's change as a person and was "impressed" with the work of Petitioner with young gang members (HT 64:13-20), speaking of returning to the community, acknowledging "there won't be a any shortage of young people there who need his help" (HT 64:20-26). However, opposed parole based on historical factors of nonviolent crimes prior to the offense, prior gang involvement, and the commitment offense (HT 65:20-16).

In telling the Board why he is no longer a threat to public safety, Petitioner relayed how as a teen-ager in the environment he grew up in he did not "have the rationale as a kid to be able to understand" (HT 69:15-17). But he understands now; and, "I live my life by that by making sure that anyone who was willing to listen or in an earshot does not go down that road" (HT 69:24-26).

Petitioner wanted the Board to understand "that I am a changed person and I have something to give and I'm eagerly looking forward to getting out on parole and offering my services to the community, to the churches or whatever" (HT 70:1-4).

///////
///////

- 13 -

## D E C I S I O N

In finding Petitioner unsuitable for parole and "would pose an unreasonable risk and danger to society" the Board relied on the following: "First and foremost is the commitment offense. There were multiple victims that were attacked, injured and one was killed in a single incident. The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering and the motive for the crime is very trivial in relation to the offense" (HT 73:23-74:4). See Cal. Code Regs., tit. 15, § 2402(c)(1)(A), (D), and (E).

For historical purposes, the Board mentioned Petitioner's prior criminal conduct and juvenile probation, as well as his early disciplinary record, but does not use them as factors of unsuitability (HT 74:12-21), being mentioned in the same context when noting Dr. Macomber's psychological evaluation as being favorable of parole and Petitioner having viable parole plans (HT 74:21-75:9). It was also noted that the District Attorney from Los Angeles County opposed parole (HT 75:15-18).

### DECISION BY THE SUPERIOR COURT

The Honorable Peter Espinoza, Judge, Los Angeles County Superior Court, found there was "some evidence" to support finding Petitioner unsuitable for parole (EXHIBIT 9), stating, "The Board based its decision on several factors, including the commitment offense, Petitioner's juvenile record and several disciplinary reports."

Judge Espinoza writes (EXHIBIT 9, p. 1): "The Court finds that there is some evidence to support the Board's finding that Petitioner's commitment offense involved multiple victims being

- 14 -

attacked, injured, or killed, the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering, and the motive for the crime was trivial in relation to the offense." Judge Espinoza then describes the offense, of which Petitioner's individual offense behavior was as follows: "A third victim surrendered his wallet containing $80. He was struck in the face with a stick. He was then beaten and kicked. He was treated for a broke nose, multiple contusions to the face and a sprained ankle" (EXHIBIT 9, p. 1). It was agreed at the time of the plea that Petitioner was personally responsible for striking the victim in the face with a stick and taking his wallet.

Additionally, Judge Espinoza also states the Board used Petitioner's juvenile history; "Thus, the record contains some evidence that Petitioner was undeterred by earlier attempts to correct his criminal conduct" (EXHIBIT 9, p. 2). The Board did not use this as an unsuitability factor. Nor, did the Board use, as Judge Espinoza insinuates, Petitioner's past disciplinary reports, but merely noted them for historical purposes.

Judge Espinoza rejected Petitioner's argument of, entering into a contract with the state for second degree murder, expecting to be punished for second degree murder and not first degree murder. Although, as Judge Espinoza opines, an indeterminate sentence is, "in legal effect, a sentence for the maximum term unless the parole authority acts to fix a shorter term" (EXHIBIT 9, p. 2), Petitioner believes that he has a reasonable expectation to be punished within the legislatively prescribed matrix for second degree murder and not first degree murder.

- 15 -

On November 10, 2006, the Board's decision became final, the Governor then having 30 days for review (California Constitution, Art. V, Section 8(b)), Petitioner's time to seek judicial relief commenced on December 9, 2006.

On February 5, 2007, Petitioner filed his writ of habeas corpus in the Superior Court of Los Angeles County, being denied on August 24, 2007 (EXHIBIT 9).

On or about September 25, 2007, Petitioner filed a habeas corpus in the California Court of Appeals, Second Appellate District, being denied on December 21, 2007 "for failure to state sufficient facts or to provide an adequate record or legal authority demonstrating entitlement to the relief requested. There is 'some evidence' to support the findings of the Board of Parole Hearings. (See In re Dannenberg (2005) 34 Cal.4th 1061, 1071)" (EXHIBIT 10), being the last reasoned decision.

On December 27, 2007, Petitioner submitted his Petition for Review to the California Supreme Court, being denied on March 12, 2008 (EXHIBIT 11).

Petitioner has diligently exhausted state court remedies.

* * * * * *

If any of these grounds was not previously presented to any other court, state briefly which grounds were not presented and why:

No new claims are presented.

///////

///////

///////

- 16 -

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2  are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3  of these cases:

4  ___PLEASE SEE MEMORANDUM OF LAW ATTACHED HERETO_____

5  _____

6  _____

7  Do you have an attorney for this petition?            Yes_____     No_**XX**___

8  If you do, give the name and address of your attorney:

9  _____

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11  this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13  Executed on ___5-11-08_____         ___Eugene Walker___

14            Date                    Eugene A. Walker
                                      Signature of Petitioner

15

16

17

18

19

20  (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS           – 17 –

M E M O R A N D U M   O F   L A W

A.    Liberty Interest in Parole

California Penal Code § 3041 gives indeterminately sentenced prisoners in California a liberty interest in parole (Greenholtz v. Inmates of Nebraska Penal and Correctional Complex (hereafter Greenholtz), 442 U.S. 1 (1979); Sass v. California Board of Prison Terms (hereafter Sass) 461 F.3d 1123 (9th Cir. 2006); In re Rosenkrantz, 29 Cal.4th 616 (2002)).

B.    Twenty-Five Years After The Predicate Act, There Is No Evidence Petitioner Is A CURRENT Threat To Public Safety.

Articulated by the United States Supreme Court: "The decision turns on...primarily what a man is and what he may become rather than simply what he has done" (Greenholtz, 442 U.S., at 10, supra). Thus, REHABILITATION is the Greenholtz doctrine.  If there is no evidence a prisoner is a CURRENT threat to the public, he or she is to be paroled (In re Rosenkrantz, 29 Cal.4th, at 655, supra; In re Sturm, 11 Cal.3d 258, 266 (1974) [the ultimate question is "whether the inmate will be able to live in society without committing additional antisocial acts"]).

Currently, the controlling authority on some evidence of what, is In re Singler, ___ Cal.App.4th ___, 2008 Cal. App. LEXIS 408 (2008), and in the Ninth Circuit is Hayward v. Marshall, 512 F.3d 536 (9th Cir. 2008), both of which relied on the same state court decisions to reach the same conclusion, except, in the case of Singler, the Singler court, the Third Appellate Disrrict, reached its conclusion after remand from the California Supreme Court with instructions (see In re Singler, 2008 Cal. App. LEXIS 408, *5-6, supra).  The Third Appellate District, as instructed by our Supreme Court, relied

- 18 -

on In re Elkins, 144 Cal.App.4th 475, 496-498 (2006); In re Lee, 143 Cal.App.4th 1400, 1400, 1408 (2006); In re Scott II, 133 Cal.App.4th 573, 594-595 (2005) (In re Singler, 2008 Cal. App. LEXIS 408, *6, supra). It is these same state appellate court cases that the Ninth Circuit relied on in Hayward v. Marshall, 512 F.3d, at 543, supra. See Ryman v. Sears and Robuck, 505 F.3d 993, 995 (9th 2007) ["where there is no convincing evidence that the state supreme court would decide differently, a federal court is obligated to follow the decisions of the state's intermediate appellate courts."]

Analyzing California's parole law, reviewing federal constitutional protections of the "some evidence" standard under the application of California law, the Ninth Circuit Court of Appeals concluded the suitability and unsuitability factors set out in Cal. Code Regs., tit. 15, § 2402(c) and (d):

> "Even though these suitability and unsuitability factors are helpful in analyzing whether a prisoner should be granted parole, California courts have made it clear that the 'findings that are necessary to deem a prisoner unsuitable for parole,' Irons [v. Carey], 505 F.3d [846], at 850 [(9th Cir. 2007)], are not that a particular factor or factors indicating unsuitability exists, but that a prisoner's release will unreasonably endanger public safety. (Citations); see Cal. Penal Code § 3041(b).... For our purposes, then, '[t]he test is not whether some evidence supports the reasons the Governor cited for denying parole, but whether some evidence indicates a parolee's release endangers public safety."

The Third Appellate District echoed the Ninth Circuit in the precedent setting decision of In re Singler, 2008 Cal. App. LEXIS 408, *38-39, supra: time and rehabilitation; In re Roderick, 154 Cal.App.4th 242, 264 (2007); In re Tripp, 150 Cal.App.4th 306, 309 (2007) ["the viciousness of the commitment offense must be balanced against the passage of time and rehabilitation"]).

Like the Board, the state court misapplied the some evidence

- 19 -

standard, relying on immutable factors rather than the passage of

time, in this case 25 years, and Petitioner's "current" threat to

public safety. The regulations that govern the Board's, and

Governor's, parole suitability decisions explicitly instruct that

an unsuitability decision is a conclusion "that the Board not schedule

the release (of) any life-maximum prisoner who is still dangerous"

(In re Dannenberg, 34 Cal.4th, at 1088, supra). The operative word

is "still." There is zero evidence Petitioner is "still dangerous."

C.  Petitioner's Individual Offense Behavior In The Instant
    Offense Was Not "Particularly Egregious."

     Although Petitioner may not be entitled to receive parole, he

is, nonetheless, entitled to have his consideration for parole "'duly

considered' based upon an individualized consideration of all relevant

factors" (In re Rosenkrantz, 2 Cal.4th, at 655, supra).

     The felony murder rule fictitiously imputes to one person the

intent of another. It cannot be doubted that under the doctrine

of vicarious liability Petitioner is guilty of second degree murder.

However, while "[a]ny participant in a conspiracy may be equally

culpable as a matter of law. The parole inquiry into the offense

severity is more factual, however, and focuses on the 'actual offense

behavior of the individual prisoner" (Roberts v. Corrothers, 812

F.2d 1173, 1180 (9th Cir. 1987); Cal. Code Regs., tit. 15, §

2402(c)(1) ["The prisoner committed the crime in an especially

heinous, atrocious, or cruel manner"] emphasis added). The doctrine

of "vicarious liability" must be individually applied on a

case-by-case basis, because "guilt is based on a combination of the

direct perpetrator's acts and the aider and abettor's own acts and

own mental state" (In re Curtis Lee, Slip Copy, 2007 WL 3122523,

- 20 -

*4 (Cal.App. 1 Dist, 2007); quoting People v. McCoy, 25 Cal.4th 1111, 1117 (2001)).  See also People v. Sandoval, 41 Cal.4th 825, 843 (2007) ["although the crime involved great violence on the part of others, that violence did not evidence a 'high degree of cruelty, viciousness, or callousness' [] on defendant's part"], emphasis in original).

The murder for which Petitioner was convicted occurred during the commission of a robbery.  It is undisputed that Petitioner was not aware of the murder even taking place.  Petitioner, being convicted under the felony murder rule, was convicted on less than the minimum elements of the commitment offense, absent any finding of malice (People v. Dillon, 34 Cal.3d 441 (1983); In re Elkins, 144 Cal.App.4th, at 497 fn. 9, supra).

## C O N C L U S I O N

It is respectfully requested that the Court ORDER the respondent to show cause why the writ should not be granted and the Board's decision of July 13, 2006 should not be vacated and a new hearing conducted in which Petitioner's parole suitability is determined based on his individual offense behavior and, after 25 plus years and his exemplary rehabilitation, if a rational connection cannot be made between the commitment offense and his current threat to public safety, why he should not be found suitable for parole and his term fixed.

DATED:  5-11-08

Respectfully submitted,

Eugene A. Walker
Petitioner in pro se

- 20 -

# EXHIBIT 1

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

The People of the State of California,

Plaintiff,

v.

EUGENE ADOLPHUS WALKER,

Defendant.

No. A374018

### INFORMATION

MURDER (Sec. 187, P.C.) - CT. I
ROBBERY (Sec. 211, P.C.) - CTS. II - V
ATTEMPTED MURDER
(Sec. 664/187, P.C.) - CT. VI

The said EUGENE ADOLPHUS WALKER

is accused by the District Attorney of and for the County of Los Angeles, State of California, by this

information, of the crime of MURDER, in violation of Section 187, Penal Code,

a felony, committed as follows: That the said
EUGENE ADOLPHUS WALKER

on or about the 26th day of November, 1951, at and in the County of Los Angeles, State of

California, did willfully, and unlawfully, and with malice aforethought murder Jesus Garcia,
a human being.

It is further alleged that the murder of Jesus Garcia was committed by
defendant EUGENE ADOLPHUS WALKER, while the defendant was engaged in the
commission of the crime of robbery in violation of Penal Code Section 211,
within the meaning of Penal Code Section 190.2(a)(17).

Filed in open Superior Court of the State of
California, County of Los Angeles on motion
of the District Attorney of said County.

DATED:

JOHN J. CORCORAN, Clerk

By _____ Deputy

JOHN K. VAN DE KAMP, District Attorney

By _____ Deputy

SIX MONTHS FROM DATE INFORMATION FILED.

8-25-82
IS

# EXHIBIT 2

OKD TO GO S/W NOTED
NOV 1982

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DEPT. 128

| | | |
|---|---|---|
| Date: **November 1, 1982** | | |
| HONORABLE: **DAVID J. AISENSON** JUDGE | **R FITTING** | |
| **D BAKER** Deputy Sheriff | **B PETERS** | (Parties and counsel abbreviations as shown) |

A574018

PEOPLE OF THE STATE OF CALIFORNIA Plaintiff
VS
**WALKER, EUGENE ADOLPHUS** 19283379

Counsel for Plaintiff **JOHN K VAN de KAMP** DISTRICT ATTY. BY
**X B SAUKKOLA** DEPUTY

`6411 - 298`

Counsel for Defendant **X H C JACKE**

NATURE OF PROCEEDINGS PROBATION AND SENTENCE

(Boxes checked if order applicable)

PROBATION DENIED. SENTENCE AS INDICATED BELOW.

Whereas the said defendant having.................... duly.............. **pleaded**
guilty in this court of the crime of **MURDER (Sec 187 PC), of the second degree, as charged in Count 1 of the information**

It is therefore Ordered, Adjudged and Decreed that the said defendant be punished by imprisonment in the **State Prison for the term prescribed by law, 15 years to Life, which sentence is ordered to run CONCURRENTLY with sentence in Case No. A369470.**

**/includes 163 days good/work time.**

☒ Defendant is given credit for...**489**........................days in custody.

It is further Ordered that the defendant be remanded into the custody of the Sheriff of the County of Los Angeles and delivered by him into the custody of the Director of Corrections at the California State Institution
☒ for Men at Chino, California
☐ for Women at Frontera, California

ENTERED
**11-1-82**

JOHN J. CORCORAN
COUNTY CLERK
AND CLERK OF THE
SUPERIOR COURT

☒ Remaining count(s) dismissed in interest of justice.
☐ Bail exonerated.

48

CR 205A (REV. 9/80) 9/80

**JUDGMENT**

PINK CARDINAL TO FILE
WHITE COPY TO MICROFILM

YELLOW COPY TO STATE S'WIDE DISTRIBUTION
GREEN COPY TO PROBATION EXPEDITE

# EXHIBIT 3

Case 2:09-cv-02482-MMC    Document    Filed 09/15/2009    Page 28 of 159

## COURT'S COPY (ORIGINAL)

### SUPERIOR COURT OF CALIFORNIA
### COUNTY OF LOS ANGELES
### PROBATION OFFICERS REPORT

REPORT SEQUENCE NO. 1

THE PEOPLE OF THE STATE OF CALIFORNIA,
Plaintiff

vs.

EUGENE ADOLPHUS WALKER,    Defendant

| DEPT. | ATTY. | JUDGE |
|---|---|---|
| 128 | JACKE | AISENSON |
| HEARING | C.I.I. NO. | COURT CASE NO. |
| 11-1-82 | A06586297 | A374018 |
| DPO | AREA OFFICE | A369470 |
| FELDMAN | CAI | |

TRUE NAME: SAME

STREET NAME: "SNOOKY"    NOV 1 1982

ADDRESS "IF IN CUSTODY, EXPECTED ADDRESS WHEN RELEASED":
L.A. COUNTY JAIL
BOOKING NO. 6411298
(LAST: 965 W. 152ND ST
LOS ANGELES, CA

PROB. NO. X-692837Q

CHARGED WITH THE CRIME(S) OF:

*SEE BELOW.

CONVICTED OF THE CRIME(S) OF:
A374018, 187 PC, SECOND DEGREE, CT 1; REMAINING CTS AND ALLEG. TO P&S
A369470, 459 PC, FIRST DEGREE

PLEA:
PLEA    326

☐ Pre-conviction invest. (131.3 C.C.P.)    ☐ Drug Diversion invest. (1000.1 (a) P.C.)

CO-DEFENDANTS:
JOHNNY DAVID GUAJARDO, FRANK GERARDO CASTRO, GUY JACK SELBY.

DISPOSITIONS:
COMMITTED TO CYA FROM JUVENILE COURT.

### PERSONAL HISTORY

| AGE | BIRTHDATE | RACE | FORMAL EDUCATION | AGE LEFT SCHOOL |
|---|---|---|---|---|
| 20 | 8-17-62 | BLACK | 10TH GRADE | 17 |

| MARITAL STATUS | HOME INCLUDES | | NO. OF DEPENDENTS |
|---|---|---|---|
| SINGLE | (LAST) MOTHER | 0 | NONE |

| OCCUPATION | INCOME PER MONTH | WHERE EMPLOYED |
|---|---|---|
| NONE | NONE | UNEMPLOYED |

| HEALTH | CAME TO STATE | CAME TO COUNTY | BRANCH MILITARY SERVICE | KIND OF DISCHARGE |
|---|---|---|---|---|
| GOOD | BIRTH | BIRTH | NONE | N/A |

AS SUPPLIED BY

1
2
3
4
5
6
7

* CHARGED WITH THE CRIMES OF:

A374018 - 187 PC (MURDER IN THE COMMISSION OF A ROBBERY) WITH SPECIAL ALLEGATIONS (PURSUANT TO 190.2(A)(17)), CT 1; 211 PC (ROBBERY WITH GREAT BODILY INJURY) PURSUANT TO 12022.7, CTS 2, 3, 4, AND 5; 664/187 (ATTEMPTED MURDER WITH A DEADLY WEAPON/A KNIFE WITH GREAT BODILY INJURY) PURSUANT TO 12022.7 PC, CT 7.
A369470 - 459 PC (BURGLARY).

(AS SUPPLIED BY DEFENDANT, JUVENILE PROBATION FILES AND INTERESTED PARTIES.)

M FILE-PROB. 115E (REV. 1877) 74

Case 2:09-cv-02467... Filed 05/19... Page 29 of...

THE DEFENDANT WHO WAS AN ONLY CHILD WAS BORN IN
LOS ANGELES AND REARED LOCALLY BY HIS MOTHER FOLLOWING PARENTAL
SEPARATION WHEN HE WAS FOUR. RAISED ON WELFARE THE DEFENDANT'S
MOTHER IS NOW RECEIVING GENERAL RELIEF FOR HERSELF. DEFENDANT HAS
A 26-YEAR-OLD HALF-SISTER WHO ALSO IS A WELFARE RECIPIENT. PRIOR
ARREST THE DEFENDANT CLAIMS THAT HE WAS LIVING WITH HIS MOTHER AND
CLAIMS NO KNOWLEDGE OF THE ADDRESS OF HIS FATHER REPORTEDLY LIVING
IN PASADENA.

BECAUSE HE "DIDN'T GET ALONG WITH THE GUYS" THE
DEFENDANT DROPPED OUT OF SCHOOL AT AGE 17 IN THE 10TH GRADE. HE
CLAIMS THAT HE STARTED NIGHT SCHOOL IN NOVEMBER OF 1981.

DEFENDANT HAS NEVER MARRIED NOR HAS HE FATHERED ANY
CHILDREN.

OTHER THAN SUMMER JOBS AND ASSIGNMENT TO WORK PROJECT
WHILE HE WAS A RECIPIENT OF GENERAL RELIEF, THE DEFENDANT HAS NEVER
HAD ANY EMPLOYMENT.

NO HEALTH PROBLEMS ARE REPORTED AND INTELLIGENCE
APPEARS LOW AVERAGE.

HE CLAIMS TO ATTEND CHURCH EVERY SUNDAY AND ENJOYS
A VARIETY OF SPORTS FOR RECREATION.

FINANCIAL SITUATION:

DEFENDANT HAD BEEN RECEIVING GENERAL RELIEF FOR ABOUT
EIGHT MONTHS PRIOR TO HIS ARREST AND WAS LIVING WITH HIS MOTHER IN

76C692G — PROB. SA — PS 2-82

AN APARTMENT RENTED BY HER. HE REPORTS NO RESOURCES OR INDEBTEDNESS.

### SUBSTANCE USE:

EXCEPT FOR MARIJUANA WHICH HE "TRIED A FEW TIMES" DEFENDANT DISCLAIMS THE ILLEGAL USE OF NARCOTICS AND DRUGS NOT MEDICALLY PRESCRIBED AND USUALLY DRINKS "TWO SIX PACKS OF BEER A WEEK".

### GANG ACTIVITY:

THE DEFENDANT HAS BEEN AN ACKNOWLEDGED MEMBER OF THE ESTRADA (V AND E) GANG FOR THE PAST YEAR AND A HALF.

### ARREST RECORD:

### SOURCES OF INFORMATION:

CII (10-12-82), JUVENILE PROBATION FILES.

### JUVENILE HISTORY:

| | |
|---|---|
| 5-3-79<br>AGE 16 | LAPD - 496 PC (RECEIVING STOLEN PROPERTY) -<br>COUNSELED AND RELEASED. |
| 7-30-79<br>AGE 16 | LAPD - 459 PC (BURGLARY) - PETITION REQUESTED,<br>PLACED ON 654 SUPERVISION; TERMINATED 2-29-80. |

(THIS WAS A BURGLARY WHICH THE DEFENDANT WAS INVOLVED WITH ANOTHER COMPANION. THE TWO CLIMBED OVER THE FENCE OF THE BUSINESS, REMOVED ABOUT EIGHT BOXES OF MERCHANDISE FROM A FENCED YARD, TOTAL VALUE WAS $320. WHEN ARRESTED AND ADVISED OF HIS RIGHTS DEFENDANT CLAIMED THAT HE DID NOT CLIMB OVER THE FENCE AND ONLY CARRIED TWO BOXES, ALLEGING THAT THREE OTHER GUYS JUMPED OVER THE FENCE BUT WHO HE REFUSED TO IDENTIFY. AT THE TIME THE DEFENDANT AND HIS MOTHER WERE LIVING IN ESTRADA PROJECTS AND MOTHER WAS ON WELFARE.)

-3-

Case 2:08-cv-02482-MMC    Document    Filed 7/15/20    Page 31 of 159

| 6-30-80 AGE 17 | LAPD - 459 PC (BURGLARY) - MATTER HELD IN ABEYANCE BECAUSE OF SUBSEQUENT ARREST (SEE BELOW). |
| 7-2-80 AGE 17 | LAPD - 211 PC (ROBBERY) - PETITION FILED ALLEGING 211 PC (ROBBERY) - PETITION SUSTAINED, DECLARED COURT WARD PURSUANT TO 602 WIC, RELEASED HOME ON PROBATION; REPARATION ORDERED; JUVENILE JURISDICTION TERMINATED 8-25-81. |

(THE VICTIM IN THIS OFFENSE WAS A 14-YEAR-OLD MALE WHO WAS ACCOSTED BY THE DEFENDANT AND OTHER GANG MEMBERS AND KNOCKED OFF HIS BICYCLE. THE DEFENDANT THEN APPROACHED THE VICTIM AND KICKED HIM IN THE FOREHEAD AND WHILE THE BOY WAS STILL LAYING ON THE GROUND DEFENDANT TOOK HIS BICYCLE AND RODE OFF IN THE DIRECTION OF ESTRADA COURTS. THE VICTIM COULD NOT IDENTIFY DEFENDANT'S COMPANIONS. DURING THE PROBATION INVESTIGATION THE DEFENDANT DENIED BEATING OR KICKING THE VICTIM AND CLAIMED HE KNEW THE BOY AND AFTER THE ATTACK WENT OVER AND HELPED HIM UP AND PICKED UP HIS BICYCLE. HIS MOTHER REPORTED THAT THERE HAD BEEN NUMEROUS GANG PROBLEMS IN THE ESTRADA COURTS WHERE THE FAMILY LIVED FOR 16 YEARS AND SHE HAD TO TAKE HIM OUT OF SCHOOL BECAUSE HE WAS "JUMPED" ON NUMEROUS OCCASIONS.)

(IN THE PREVIOUS INCIDENT IN WHICH HE HAD BEEN ARRESTED FOR BURGLARY ON 6-30-80 THE DEFENDANT AND COMPANIONS STOLE MERCHANDISE FROM A FRUIT STAND.)

IN FINAL REPORT SUBMITTED TO JUVENILE COURT DATED AUGUST 25, 1981 IT WAS REPORTED THAT THE DEFENDANT WAS DISABLED UNTIL HE GOT A JOB AT A NOVELTY COMPANY ON AUGUST 17, 1981 AND DENIED THAT HE WAS A MEMBER OF THE ESTRADA COURTS GANG WHERE HE LIVED ALTHOUGH HE ACKNOWLEDGED THAT HE HAD FRIENDS FROM THE GANG. JUVENILE COURT JURISDICATION WAS TERMINATED BECAUSE OF THE DEFENDANT'S ARREST PENDING IN ADULT COURT.

PRESENT OFFENSE:

THE DEFENDANT IS APPEARING BEFORE THE COURT ON TWO

1   SEPARATE CASES.

2           THE FIRST ARREST OCCURRED AT 11:45 A.M., ON

3   JUNE 26, 1981, BY OFFICERS OF THE LOS ANGELES POLICE DEPARTMENT,

4   HOLLENBECK DIVISION, AT 2111 EAST FIRST STREET ON SUSPICION OF

5   BURGLARY.  IN A369470, HE WAS CHARGED WITH 459 PENAL CODE (BURGLARY).

6   HE WAS RELEASED ON HIS OWN RECOGNIZANCE THE SAME DAY OF ARREST AND

7   PLEADED GUILTY TO FIRST DEGREE BURGLARY ON SEPTEMBER 28, 1982 IN

8   DEPARTMENT 128.  FURTHER PROCEEDINGS WERE CONTINUED FOR PROBATION

9   AND SENTENCING HEARING TO OCTOBER 25, 1982 AND SUBSEQUENTLY

10  CONTINUED TO THIS DATE.  DEFENDANT HAS BEEN IN CUSTODY SINCE HIS

11  SECOND ARREST AT 9:15 A.M., ON DECEMBER 4, 1981, BY OFFICERS OF

12  THE LOS ANGELES POLICE DEPARTMENT, HOLLENBECK DIVISION, AT

13  1200 NORTH STATE STREET ON SUSPICION OF MURDER.  IN A374018 HE

14  WAS CHARGED WITH 187 PENAL CODE (MURDER IN COMMISSION OF A ROBBERY)

15  WITH SPECIAL ALLEGATIONS ALLEGED PURSUANT TO 190.2(A)(17), COUNT ONE

16  211 PENAL CODE (ROBBERY WITH GREAT BODILY INJURY) PURSUANT TO

17  12022.7, COUNTS TWO, THREE, FOUR AND FIVE, 664/187 PENAL CODE

18  (ATTEMPTED MURDER WITH DEADLY WEAPON/A KNIFE AND GREAT BODILY

19  INJURY) PURSUANT TO 12022.7.  ON SEPTEMBER 28, 1982, IN DEPARTMENT

20  128 DEFENDANT PLEADED GUILTY TO 187 PENAL CODE, SECOND DEGREE, AS

21  CHARGED IN COUNT ONE.  FURTHER PROCEEDINGS AND DISPOSITION OF

22  REMAINING COUNTS AND ALLEGATIONS WERE CONTINUED FOR PROBATION

23  AND SENTENCE HEARING.

Case 2:19-cv-02482-EMC   Document 1   Filed 05/15/20   Page 33 of 159

CODEFENDANTS IN A374018 WERE JOHNNY DAVID GUAJARDO, DATE OF BIRTH: SEPTEMBER 8, 1966; FRANK GERADO CASTRO, DATE OF BIRTH: FEBRUARY 5, 1966, AND GUY JACK SELBY, DATE OF BIRTH: JUNE 9, 1968. ALL THREE WERE COMMITTED TO THE CALIFORNIA YOUTH AUTHORITY FROM JUVENILE COURT.

BASED ON INFORMATION IN THE DISTRICT ATTORNEY FILE AND CRIME REPORT SUMMARIZED FACTS ARE AS FOLLOWS:

THE MURDER VICTIM WAS A 25-YEAR-OLD MALE, JESUS GARCIA. ON NOVEMBER 26, 1981, AT ABOUT 2:30 A.M., VICTIM WAS IN A 1975 PONTIAC WITH HIS BROTHER, NASARIO GARCIA, VICTIM IN COUNT THREE, LEANDRO LOERA, VICTIM IN COUNT FOUR AND ALFREDO GONZALEZ, VICTIM IN COUNT FIVE. THE DECEASED IS NAMED AS VICTIM IN COUNTS ONE AND TWO. THE DECEASED, HIS BROTHER AND COMPANIONS RAN OUT OF GAS IN THE AREA OF LORENA AND OLYMPIC BOULEVARD. WHILE AT THE LOCATION SEVERAL MALES DESCRIBED AS MALE LATINS AND ONE MALE BLACK ATTACKED AND BEAT THEM WITH STICKS AND ROBBED THEM OF MONEY. JESUS GARCIA WAS STABBED AT THE SCENE. CAUSE OF DEATH WAS DUE TO MULTIPLE STAB WOUNDS OF THE CHEST. SOME OF THE VICTIM'S PROPERTY WAS DISCARDED WITHIN THE ESTRADA HOUSING PROJECT IN THE AREA USED BY THE "V AND E" (ESTRADA GANG MEMBERS) A GATHERING PLACE KNOWN AS "TINNY'S WALL".

VICTIM ALFREDO GONZALEZ SAID THAT HE HAD BEEN SEATED IN THE CAR WHEN ABOUT SIX MALES APPROACHED, PULLED OUT KNIVES AND

-6-

Case 2:10-cv-02048 ... 05/15/200... Page ... of 1...

DEMANDED MONEY. HE WAS FORCED OUT OF THE CAR TOGETHER WITH THE

DECEASED AND THE BROTHER OF THE DECEASED. VICTIM GONZALEZ

SURRENDERED HIS WALLET CONTAINING $200 AND TWO OF THE SUSPECTS

THEN TRIED TO STAB HIM, HOWEVER, HE MANAGED TO FLEE. AS HE WAS

RUNNING HE HEARD TWO SHOTS FIRED AND HEARD BULLETS HIT THE GROUND

NEXT TO HIM AND HEARD ONE OF THE SUSPECTS YELL OUT "IF YOU COME

BACK TO YOUR CAR WE'LL KILL YOU".

      THE BROTHER OF THE DECEASED, NESARIO GARCIA,

CONFIRMED THAT HE AND HIS BROTHER AND COMPANIONS HAD RUN OUT OF

GAS AND FOUR SUSPECTS APPROACHED THEM. FENDERS TO THEIR CAR WERE

BROKEN AND THE SUSPECTS DEMANDED MONEY. GARCIA SAID THAT ONE OF

THE SUSPECTS OPENED THE FRONT DOOR AND TWO GRABBED HIM AND STABBED

HIM IN THE BACK. HE GOT OUT OF THE CAR AND WAS TOLD BY ONE OF THE

SUSPECT "GIVE IT OR WE'LL KILL YOU". HE PLEADED FOR THEM TO STOP

THE ASSAULT AND, SURRENDERED HIS WALLET CONTAINING $180. HE ALSO

SURRENDERED A WOMAN'S WATCH WHEN TWO OF THE SUSPECTS STABBED HIM.

      VICTIM LOERE CONFIRMED HIS COMPANION'S STATEMENT

AND STATED THAT HE WAS ALSO ROBBED AND HIS WALLET CONTAINING $30

WAS TAKEN. ALTHOUGH HE ASKED SUSPECTS NOT TO BEAT HIM HE WAS

HIT ACROSS THE FACE WITH A STICK AND AS HE FELL TO THE GROUND HE

WAS BEATEN AND KICKED AND ONE OF THE SUSPECTS TOOK OFF HIS SHOES

AND WHILE DOING SO JUMPED ON HIS TRYING TO BREAK HIS LEG.

      VICTIM NASARIO GARCIA WAS HOSPITALIZED AT

-7-

MC8270 - PROB. 8A - P2 2 82

LOS ANGELES COUNTY/USC MEDICAL CENTER AND TREATED FOR MULTIPLE LACERATIONS, STABBED WOUNDS TO THE FACE, EXTREMETIES AND ABDOMEN.

VICTIM LEANDRO LOERA WAS TREATED AT COUNTY/USC MEDICAL CENTER FOR MULTIPLE CONTUSIONS TO THE FACE, FRACTURED NOSE AND BADLY SPRAINED ANKLE.

VICTIM ALEJANDRO GONZALEZ SUSTAINED A SUPERFICIAL ABRASION TO THE ABDOMEN.

(AN AUTOPSY REPORT OF THE DECEASED REVEALED THAT HE HAD BEEN STABBED MULTIPLE TIMES AND ONE OF THE STAB WOUNDS HAD SEVERED THE CAROTORD ARTERY AND ONE HAD PENETRATED THE HEART.)

DURING THE INVESTIGATION, INVESTIGATING OFFICERS RECEIVED INFORMATION FROM AN ANONYMOUS INFORMANT THAT GUY SELBY, JOHNNY GUHARDO, AKA: "LIMPY", EUGENE WALKER, AKA: "SNOOKY", AND FRANKIE CASTRO, AKA: "SLEEPY", FROM THE COLONIA GANG COMMITTED THE ROBBERY/MURDER.

ON DECEMBER 2, 1981, DETECTIVES WENT TO GUAJARDO'S RESIDENCE TO ARREST HIM FOR MURDER. AFTER HE WAS ARRESTED AND ADVISED OF HIS RIGHTS THEY RECOVERED A BUCK KNIFE IN A SHEATH AT THE FOOT OF HIS BED. AFTER HE WAIVED HIS RIGHTS HE ADMITTED HIS PARTICIPATION IN THE ROBBERY/MURDER AND SAID THAT HE, CASTRO, SELBY AND WALKER WERE AT "TINNYS WALL". A GUY WAS AT THE PHONE BOOTH AND THEY (GUAJARDO AND HIS COMPANIONS) WENT THERE TO GET MONEY. HE SAW A GUY WALKING TOWARD THE PHONE BOOTH FROM THE CAR

-8-

AND HE SAID HE GOT A BROOMSTICK, WENT UP TO THE GUY IN THE PHONE
BOOTH AND ASKED HIM IF HE HAD ANY MONEY. THE MAN REPLIED IN
SPANISH THAT HE HAD NONE AND GUAJARDO SAID HE HIT HIM ONCE. HE
THEN WALKED AND STOOD BEHIND THE CAR AND SAW WALKER GET HIT ON
THE FACE BY THE GUY IN THE BACK SEAT AND THEN WALKER HIT HIM.
GUARDO SAID HE GOT NO MONEY AND THEY RAN WHEN A CAR CAME AND
SAID THAT SELBY ALSO HAD A STICK AND HIT THE MAN IN THE PHONE
BOOTH ONCE OR TWICE.

CASTRO WAS ALSO ARRESTED AT HIS HOME AND AFTER HE
WAS ADVISED OF HIS RIGHTS HE SAID THAT HE AND HIS COMPANIONS HAD
BEEN AT "TINNYS WALL" SMOKING "KOOLS". HE HAD A BUCK KNIFE AND
WAS GOING TO ROB THE VICTIMS. HE SAID SELBY ALSO HAD A KNIFE AND
GUJARDO AND SELBY WALKED UP TO THE GUY STANDING IN THE STREET WHILE
HE WENT UP TO THE DRIVER'S SIDE AND TOLD THE GUY TO OPEN THE DOOR
WHICH WAS LOCKED. HE THEN WENT TO THE PASSENGER SIDE, BROKE THE
WINDOW AND OPENED THE DOOR. HE SAID THE GUY SITTING IN THE CAR
HIT HIM AND HE HIT HIM BACK AND WHEN HE WAS OUT OF THE CAR ASKED
HIM FOR MONEY. HE SAID THAT HE GOT HIT IN THE FACE AND THE GUY
IN THE BACK SEAT GOT OUT AND HIT HIM. CASTRO SAID THAT HE HAD THE
KNIFE IN HIS HAND, REMEMBERS FIGHTING BUT STABBING THEM. HE CLAIMS
HE ONLY GOT ABOUT $2 IN CHANGE. THE NEXT DAY THEY RAN TO GUAJARDO'S
HOUSE AND FELL ASLEEP AND THAT AFTERNOON HE, SELBY AND GUAJARDO
WERE TOGETHER AND SELBY SAID HE WAS GOING TO GET RID OF THE KNIFE

-9-

Case 2:82-cr-00482-MMC    Document 1    Filed 05/15/20    Page 37 of 159

1  CASTRO WENT HOME AND WASHED HIS PANTS TO GET THE BLOOD OUT.

2          WALKER WAS ARRESTED AT LOS ANGELES COUNTY/USC

3  MEDICAL CENTER AND AFTER HE WAS ADVISED OF HIS RIGHTS WHICH HE

4  WAIVED HE SAID THAT EARLY ON THANKSGIVING MORNING HE WAS IN THE

5  ESTRADA COURTS WITH THE PERSONS HE IDENTIFIED AS "HUERO AND GUMBY"

6  AND CLAIMED THAT HE DID NOT KNOW THEIR REAL NAMES.  THEY WERE

7  SITTING DRINKING BEER AND SMOKING CIGARETTES WHEN HE HEARD SOME

8  YELLING COMING FROM LORENA AND OLYMPIC.  HE RAN OVER TO SEE WHAT

9  WAS HAPPENING AND SAW SOME GUYS HITTING A GUY IN A PHONE BOOTH.

10 HE RAN UP TO THE CAR AND "HUERO" GAVE HIM A BOTTLE OF LIQUOR AND

11 AT ABOUT THAT TIME HE PICKED UP A STICK AND SOME OTHER GUYS CAME

12 RUNNING OFF HE SAW "HUERO" PULLING A GUY FROM THE BACK SEAT WITH

13 SOME OTHER GUYS.  DEFENDANT CLAIMED HE RAN BACK TO THE PROJECTS

14 NEXT TO "TINNYS WALL" AND ABOUT TEN MINUTES LATER THE REST OF THE

15 GUYS CAME BACK, ONE OF THEM WITH A KNIFE AND SAID THAT "I STABBED

16 THEM".  HE SAID HE SAW BLOOD ON THE KNIFE.  AFTER THAT HE LEFT

17 WITH GUAJARDO AND SPENT THE NIGHT THERE.

18          INVESTIGATING OFFICERS BOOKED THE TENNIS SHOES THE

19 DEFENDANT WAS WEARING.  THE SHOEPRINTS AT THE CRIME RESEMBLED THE

20 SOLES FROM THESE SHOES.

21          SUMMARIZED FACTS REGARDING THE BURGLARY ARE AS

22 FOLLOWS:

23          ON JUNE 24, 1981 AT 8:00 P.M., OFFICERS WORKING

-10-

7

HOLLENBECK SPECIAL PROBLEMS RECEIVED INFORMATION OF A BURGLARY
WHICH HAD OCCURRED AT 3356 HUNTER STREET AT 10:00 P.M. ON
JUNE 23, 1981. FEMALE VICTIM REPORTED THAT SHE WAS SLEEPING IN
HER UPSTAIRS BEDROOM AND WAS AWAKENED BY NOISES DOWNSTAIRS OF
SOMEONE ENTERING. SHE WENT DOWNSTAIRS AND SAW THE DEFENDANT WHOM
SHE KNEW AS "SNOOKY" FOR ABOUT TWO YEARS AND TWO OTHER MALE
JUVENILES. WHEN THEY SAW HER THEY ALL TURNED AND RAN OUT THE
BACK DOOR WITH THIS DEFENDANT TAKING A WALL MIRROR. THE NEXT DAY
SHE SAW THEM TRYING TO SELL THE MIRROR. IN ADDITION A CAMERA AND
BICYCLE WERE STOLEN.

   DEFENDANT WAS ARRESTED AFTER HE CAME TO HOLLENBECK
STATION IN RESPONSE FROM OFFICERS REQUEST REGARDING THE BURGLARY.

DEFENDANT'S STATEMENT:

   A WRITTEN STATEMENT FROM DEFENDANT HAS NOT BEEN
RECEIVED.

   HE CLAIMS HE IS NOT GUILTY IN THE MURDER/ROBBERY
AND SAID THAT HE PLEADED GUILTY BECAUSE HIS ATTORNEY SAID THAT HE
"CAN'T BEAT IT". IN HIS EXPLANATION OF WHAT HAPPENED ON THE DAY
OF THE OFFENSE HE STATES HE WAS KICKING BACK WITH "HOME BOYS" AT
THE ESTRADA COURT. A COUPLE OF GUYS SAID THEY WERE GOING TO ROB
SOMEONE. HE LATER HEARD SOME YELLING AND ONE OF THE GUYS (FRANK
CATRO) WAS STABBING ONE OF THE VICTIMS. DEFENDANT SAID THAT HE
SAW ANOTHER GUY THEN RAN TOWARD HIM SWINGING AT HIM WITH HIS HANDS

Case 3:08-cv-02493-MMC   Document 1   Filed 05/15/08   Page 39 of 159

CASTRO WAS STILL STABBING THE OTHER GUY, AND TWO OTHER GUYS JUMPED
AND BEAT SOME OTHER GUYS.  CASTRO CALLED THEM OVER AND THEN STARTED
STABBING THE GUY.  DEFENDANT HIT HIM, CASTRO THEN STARTED STABBING
SOME OTHER GUYS THE DEFENDANT RAN AWAY.  HE PLEADED GUILTY TO
SECOND DEGREE MURDER BECAUSE IT WAS "THE ONLY CHANCE I HAD".  HIS
MOTHER VISITS HIM IN JAIL AND WISHES HIM "THE BEST OF LUCK".  WHEN
QUESTIONED ABOUT THE BURGLARY HIS ONLY COMMENT WAS THAT HE "GUESSES
HE COMMITTED IT.  IN INTERVIEW THERE WAS NO EVIDENCE OF REMORSE AND
THE DEFENDANT'S ATTITUDE WAS ONE OF INDIFFERENCE.

VICTIMS:

PROBATION OFFICER HAS BEEN UNABLE TO CONTACT THE
VICTIMS.

INTERESTED PARTIES:

INVESTIGATING OFFICER MILLER, HOLLENBECK DETECTIVES,
STATES THAT THIS DEFENDANT WAS THE INSTIGATOR IN THE MURDER AND
ROBBERIES, THE LEAST CONCERNED OF ALL THOSE INVOLVED AND SHOWED
NO REMORSE.  HE REGARDS HIM AS WITHOUT ANY REDEEMING QUALITIES AND
RECOMMENDS THAT HE BE SENTENCED TO STATE PRISON FOR AS LONG AS
POSSIBLE.

DEPARTMENT OF PUBLIC SOCIAL SERVICES RECORDS *DISCLOSE*
THE DEFENDANT'S MOTHER'S AID TO FAMILIES WITH DEPENDENT CHILDREN
CASE WAS TERMINATED JULY 31, 1981.  SHE IS NOW RECEIVING GENERAL
RELIEF.

-12-

EVALUATION:

IN REVIEWING HIS RECORD THERE CAN BE NO QUESTION OF DEFENDANT'S INGRAINED DISRESPECT FOR THE LAW AND THE RIGHTS OF OTHERS. HIS ONGOING PATTERN OF ANTI-SOCIAL BEHAVIOR WAS UNDOUBTEDLY CONDITIONED BY HIS GANG AFFILIATIONS WHICH APPARENTLY TAKE PRECEDENCE OVER ALL OTHER CONSIDERATIONS. IN REVIEWING HIS BACKGROUND IT IS SIGNIFICANT THAT THE DEFENDANT'S MODUS OPERANDI IS ONE OF COMMITTING CRIMES WITH OTHERS WORKING "PACKS" AS WAS THE CASE IN THIS VICIOUS AND BRUTAL MURDER.

THERE IS NO EVIDENCE THAT THE DEFENDANT, WHO DESPITE HIS PLEA, DENIES ALL GUILT HAS ANY REMORSE. HIS CRIME PARTNERS WERE JUVENILES AND IT MUST BE PRESUMED THAT THE DEFENDANT AS THE ONLY ADULT WAS AS THE INVESTIGATING OFFICER INDICATES THE INSTIGATOR AND MOST CULPABLE.

IT IS ALSO RELEVANT THAT THE MURDER OCCURRED AFTER THE DEFENDANT HAD BEEN RELEASED ON HIS OWN RECOGNICANCE IN THE BURGLARY IN WHICH HE IS ALSO TO BE SENTENCED. THAT CRIME OCCURRED WHILE THE DEFENDANT WAS STILL ON JUVENILE PROBATION.

IT MUST BE CONCLUDED THAT STREET CRIME IS A WAY OF LIFE WITH THE DEFENDANT AND IN THIS INSTANCE CULMINATED IN THE BRUTAL AND VICIOUS MURDER. THE DANGER TO THE COMMUNITY CAN NOT BE OVER-EMPHASIZED AND ALTHOUGH HE MAY BE ELIGIBLE FOR THE YOUTH AUTHORITY THE AGGRAVATED NATURE OF THIS OFFENSE AND FACTORS NOTED

Case 2:90-cv-00248 ... Document ... Filed 05/15/20... Page ... of ...

I certify this to be a true copy of the original

Name _Steve Schal_ Date _12-8-82_  Name _Connie B. Hansen_ Date _12-8-82_

1  ABOVE CLEARLY INDICATE THAT COMMITMENT TO STATE PRISON IS

2  APPROPRIATE AND JUSTIFIED.

3     SENTENCING CONSIDERATIONS:

4  CIRCUMSTANCES IN AGGRAVATION:

5     1.   DEFENDANT SHOULD BE SENTENCED ON TWO SEPARATE
          CASES.

6

7     2.   CIRCUMSTANCES IN 374018 INVOLVED GREAT VIOLENCE,
          BODILY HARM RESULTING IN THE DEATH OF ONE HUMAN
          BEING AND THE INJURY OF OTHERS DISCLOSING A HIGH

8         DEGREE OF CRUELTY, VICIOUSNESS AND CALLOUSNESS.

9     3.   THE DEFENDANT WAS ARMED WITH AND USED A WEAPON
          AT THE TIME OF THE COMMISSION OF THE CRIME.

10

11    4.   A374018 INVOLVED MULTIPLE VICTIMS.

12    5.   THE DEFENDANT WAS THE ONLY ADULT IN A374018 AND IS
          DESCRIBED AS THE INSTIGATOR.

13

14    6.   DEFENDANT WAS ENGAGED IN AN ONGOING CRIME SPREE.

15    7.   A369470 OCCURRED WHILE THE DEFENDANT WAS ON
          JUVENILE PROBATION.

16    8.   A374018 OCCURRED AFTER THE DEFENDANT WAS RELEASED
          ON HIS OWN RECOGNIZANCE IN THE ABOVE.

17

18    9.   THE DEFENDANT'S RECORD IS NUMEROUS AND OF
          INCREASING SERIOUSNESS.

19    CIRCUMSTANCES IN MITIGATION:

20    NONE.

21     THE HIGH-BASE TERM IS RECOMMENDED.  IN ADDITION,

22  CONSECUTIVE SENTENCING IS WARRANTED SINCE THESE TWO OFFENSES WERE

23  SEPARATE AND UNRELATED AND COMMITTED AT SEPARATE TIMES AND PLACES

-14-

AND A374018 INVOLVED MULTIPLE VICTIMS.

RECOMMENDATION:

IT IS RECOMMENDED THAT PROBATION BE DENIED AND DEFENDANT SENTENCED TO STATE PRISON WITH PRE-IMPRISONMENT CREDIT OF 326 DAYS.

RESPECTFULLY SUBMITTED,

KENNETH E. KIRKPATRICK,
PROBATION OFFICER

BY

DORIS FELDMAN, DEPUTY
CENTRAL ADULT INVESTIGATIONS
974-9373.

READ AND APPROVED:

I HAVE READ AND CONSIDERED
THE FOREGOING REPORT OF THE
PROBATION OFFICER.

KENNETH HILL, SDPO

(SUBMITTED: 10-20-82)
(RECEIVED: 10-20-82)
(TYPED: 10-22-82)
OF:GHB (7)

JUDGE OF THE SUPERIOR COURT

IF PROBATION IS GRANTED, IT IS RECOMMENDED THAT THE COURT DETERMINE DEFENDANT'S ABILITY TO PAY COST OF PROBATION SERVICES PURSUANT TO SECTION 1203.1B PENAL CODE.

-15-

78C692G - PROB. 6A - PS 2-82

# EXHIBIT 4

LIFE PRISONER HEARING DECISION FACE SHEET

| | **Records Use Only** |
|---|---|
| [ ] PAROLE GRANTED - (YES) | |
| CDC:  Do not release prisoner before | Parole Release Date |
| Governor's review | YR    MO    DAY |
| | |
| [ ] PAROLE DENIED - (NO) | Attach Prison Calculation Sheet |

[ ] AGREED UNSUITABLE (Attach 1001A Form) FOR:_____YEAR(S)

[X] HEARING POSTPONED/REASON: *Need new psych eval Last 1999.*
*1002 attached*

## PANEL RECOMMENDATIONS AND REQUESTS

**The Board Recommends:**

[ ] No more 115's or 128A's       [ ] Stay discipline free

[ ] Work to reduce custody level  [ ] Learn a trade*        [ ] Earn positive chronos

[ ] Get self-help*                [ ] Get therapy*          [ ] Get a GED*

[ ] Recommend transfer to_____

[ ] Other_____

*These programs are recommended if they are offered at your prison and you are eligible/able to participate.

**Penal Code 3042 Notices**    [ X ] Sent  Date: 4/19/04

| Commitment Offense(s) | **PC187** | **MURDER 2ND** |
|---|---|---|
| | Code(s) | Crime(s) |
| | **A374018** | **1** |
| | Case #(s) | Count #(s) |

| Date Inmate Came to CDC | Date Life Term Began | Minimum Eligible Parole Date |
|---|---|---|
| 11/9/82 | 11/9/82 | 7/24/90 |

| [ ] Initial Hearing | [ X] Subsequent (Hr #7 | Date of Last Hearing        12/18/01 |
|---|---|---|

CDC Representative

Attorney for Prisoner                          Address

D.A. Representative                            County    LOS ANGELES

This form  and the Board's decision at the end of the hearing is only proposed and NOT FINAL. It will not become final until it is reviewed.

Chair _____    Date _____

Panel Member _____    Date _____

Panel Member _____    Date _____

| NAME | CDC # | CTF-SOLEDAD | CALENDAR | DATE |
|---|---|---|---|---|
| WALKER, EUGENE | C-55991 | | May-04 | 5/25/04 |

BPT 1001 (REV. 08/03)

BOARD OF PRISON TERMS                                   STATE OF CALIFORNIA
## SETTING A LIFE PRISONER TERM - PAROLE DENIED

### 11. NOTE TO CDC STAFF: RECOMMENDATIONS AND REQUESTS

☒ 3. the panel's belief that the prisoner's current mental health is an important issue. In the new full evaluation, the panel requests that the clinician specifically address the following:

    ☒ a. the prisoner's violence potential in the free community;

    ☒ b. the significance of alcohol/drugs as it relates to the commitment offense and an estimate of the prisoner's ability to refrain from use/abuse of same when released;

    ☐ c. the prisoner's psycho-sexual problems;

    ☒ d. the extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes;

    ☒ e. the need for further therapy programs while incarcerated.

    ☒ f. other: _Likley hood of Retureng To Gang_

    _____

☐ 4. the panel's belief that the prisoner has deteriorated psychologically and there appears to be a need for treatment. The panel bases this conclusion upon

_____

_____

    _Len Rein_    _BpT Comm_

☐ B. (Other requests to CDC staff): _____

_____

_Alken, Eugene C 55891  CTF Soledad  5-25-04_

# EXHIBIT 5

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
SEPTEMBER 2004 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
JULY 16, 2004

This is a psychological evaluation for the Board of Prison Terms on inmate Eugene
Walker, CDC# C-55991. The inmate was interviewed in a psychodiagnostic evaluation
that lasted three hours. In addition, the medical file and central file were reviewed.

The prior evaluation included a psychosocial assessment that is still basically current and
valid, and will not be repeated at this point.

Inmate Eugene Walker is a 41-year-old (date of birth: 06/17/62), African-American, first
term male who is serving a 15-year-to-life sentence from Los Angeles County for the
offense of PC 187, murder, second degree. This offense occurred on 11/01/82. The
MEPD is 07/24/90.

CLINICAL ASSESSMENT

**XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS:**

Inmate Walker was quite open and self-disclosing during the lengthy interview.
He was alert and well oriented. His hygiene and grooming were appropriate. His
thinking was rational, logical, and coherent. He is functioning in the average
range intellectually. His affect was appropriate. There is no evidence of
depression or anxiety. There is no evidence of a thought disorder. There is no
evidence of cognitive impairment. There is no history of serious head injuries.
His judgment is intact. His self-awareness and insight were also good.

Inmate Walker's thinking is quite prosocial. Although in the past his thinking
was criminally oriented, he has matured and grown up a great deal. There is no
longer any evidence of criminal thinking. In fact, he has an adversity towards
individuals who demonstrate delinquent or criminal values.

In considering the current diagnostic classifications that would be appropriate, it
is evident that when this inmate was arrested at the age of 19, he certainly met the
criteria of a history of conduct disorder, as well as antisocial behavior and
thinking. However, he has gone through some serious, life-changing experiences
while incarcerated. His thinking at this time is quite prosocial. He has feelings of
empathy and concern towards others. As a result, there is no evidence of
personality disorder or other psychopathology at this point in time.

**WALKER        C-55991        CTF-CENTRAL        07/16/04        gmj**

COPY TO INMATE ON

WALKER, EUGENE
CDC NUMBER: C-55991
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

## CURRENT DIAGNOSTIC IMPRESSIONS:

| | |
|---|---|
| AXIS I: | No Contributory Clinical Disorder. |
| AXIS II: | No Contributory Personality Disorder. |
| AXIS III: | No Contributory Physical Disorder. |
| AXIS IV: | Life-term incarceration. |
| AXIS V: | Current GAF = 90. |

Inmate Walker participated at DVI in the Straight Life program from 1992 to
1995. His participation in this program was a life-changing experience for him.
As a former street gang member, he was chosen to confront juvenile delinquents
sent by the courts to this program. These juvenile delinquents were the same kind
of delinquents that inmate Walker was at that age. In talking to them, reasoning
with them, and trying to confront their criminal thinking, he found himself
looking at his own values that he held as a teenager. He also saw how clearly
these values were destructive and dangerous. As a result, he matured and adopted
counter-delinquent values, which he now firmly supports. He stated, "I was a
young punk that was caught up in peer pressure foolishness. Nothing positive
comes out of these groups."

Inmate Walker had a pattern of minor disciplinaries reflecting a lack of interest in
rules and regulations. It was also at that point that this behavior changed, and he
has remained disciplinary-free now for the last seven years.

Inmate Walker was very successful in confronting these delinquent youths, some
of them very highly entrenched in their delinquent peer groups and lifestyle. He
enthusiastically reported that several hardcore youths changed their own life
patterns, which he learned about when he attended the annual banquet. They had
dropped out of their gangs, completed their GEDs, and were on the way to a law-
abiding life. This had a dramatic impact on inmate Walker. He plans on
continuing to work with delinquent youths in the community when he is paroled.
His enthusiasm for this project is sincere and genuine. He would be an excellent
role model for this type of program.

## XIII. REVIEW OF LIFE CRIME:

Inmate Walker was the oldest (age 19) participant in the commitment offense, in
which a man was stabbed to death. His younger crimes partners were juveniles.
He stated that the criminal attack upon the victims, who were stranded in the
neighborhood because they ran out of gas, was already in progress when the
assailants called for him to come and help them. He grabbed his stick and ran
over there. He admits that he beat the victims with the stick, and may have even
beaten the victim, who was stabbed to death, with a stick. However, he did not
have a knife, and he denies stabbing anybody. One of the juveniles admitted to
stabbing the victim.

WALKER        C-55991        CTF-CENTRAL        07/16/04        gmj

WALKER, EUGENE
CDC NUMBER: C-55991
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

Inmate Walker accepts responsibility for being at the crime scene. He admitted that he did participate in this vicious assault, and as a result he does feel responsible for the catastrophic outcome. He pled guilty to this offense in a plea bargain. Over the years, as he has grown in responsibility and maturity, the realization of the severity of this crime has increased. At this point, he feels very sorry, remorseful, and foolish about his participation. His feelings of remorse are quite sincere and genuine.

XIV.    ASSESSMENT OF DANGEROUSNESS:

A.    In considering inmate Walker's violence potential within the institutional environment, his pattern of disciplinaries shows that when he was initially placed in the institution, he was young, immature, rebellious, and impulsive. Over the years, he has matured a great deal, and this is no longer the case. Even though he is still living in an institution that has ongoing racial conflicts and inmate altercations, he is deliberately avoiding any compromising situations or negative associates that could result in problems. He shows a great deal of maturity, introspection, and good judgment. As a result, his potential for dangerous behavior in the institutional environment is definitely far below average.

B.    In considering the dangerousness potential when released to parole, the same comments are appropriate. This man does not pose a risk to the community. His violence potential is no more than the average citizen in the community. In fact, he has learned lessons that many citizens in the community have not learned. Therefore, his potential for violence may be even less than the average citizen.

C.    In considering risk factors for this inmate, drugs and alcohol have never been a problem in this case, and therefore they do not pose a risk factor. The last BPT panel asked the question about the probability of inmate Walker returning to gang activities. After three hours' evaluation and an in-depth investigation of his thinking, this writer is certain that he will not return to gang involvement. In fact, his plans are the direct opposite, to engage in a constructive, positive, prosocial manner in the lives of young delinquent gang members to teach them how destructive their lifestyle is towards others, as well as themselves, the foolishness of peer loyalties, and the destructiveness of any drug or alcohol involvement.

XV.    CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

There are no mental or emotional problems in this case that would interfere with a parole date at this time. Inmate Walker is a skilled cabinet-maker with several years of experience. He is currently working in that capacity in PIA industries.

WALKER          C-55991          CTF-CENTRAL          07/16/04          gmj

WALKER, EUGENE
CDC NUMBER: C-55991
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

He also has skills as a butcher. He has several active and current job offers from the community. Both of these trades are very valuable in the Los Angeles area, where he is paroling, and he will have no problems obtaining and securing employment. He has family support. He has a residence available and waiting. The prognosis for successful community adjustment is excellent in this case.

Melvin Macomber, Ph.D.
Licensed Psychologist
Correctional Training Facility, Soledad

B. Zika, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

MM/gmj

D: 07/16/04
T: 08/20/04

*D:\Word Files\BPT - 2004\WALKER, EUGENE  C-55991  09-04  MACOMBER.doc*

WALKER          C-55991          CTF-CENTRAL          07/16/04          gmj

# EXHIBIT 6

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
MAY 1999

CORRECTIONAL TRAINING FACILITY
MARCH 3, 1999

This is the psychological evaluation for the Board of Prison Terms for inmate Eugene Walker. This report is based upon a personal clinical interview of the inmate, conducted on 3/3/99, as well as a review of his Central File and his unit health record. This clinical interview and the review of all pertinent documents were for the express purpose of preparing this report.

SECTION I:   IDENTIFYING INFORMATION

Inmate Walker is a 36 year old, single, Black male, born on 8/17/62. His reported religious affiliation is Christian. He has no obvious unusual physical characteristics. However, he reported having a nickname of "Snooky".

SECTION II:   DEVELOPMENTAL HISTORY

Inmate Walker denied any history of birth defects, abnormalities of developmental milestones, a history of cruelty to animals, arson, or a significant childhood medical history. He further denied any history of physical or sexual abuse as either a perpetrator or a victim.

SECTION III:   EDUCATION

Inmate Walker reported that he attended public school and completed the tenth grade. He noted further that while in high school he participated on both the school's football team and the track and field team. Inmate Walker stated that he received his high school diploma in DVI in 1991 through the Tracy Adult School. He said that he has taken no other postgraduate courses. He stated that his current involvement and interests in educational activities includes his current participation in the Entrepreneur Opportunities Program here at CTF.

SECTION IV:   FAMILY HISTORY

Inmate Walker reported that both of his parents are currently living. He said that his mother, who is now 66 years old, is employed as a domestic worker and that his father, now 68, worked for the City of Pasadena as a city employee. He described his early relationship with his parents as warm and supportive and nonabusive. He stated further that his mother and father separated when the inmate was approximately 9 years old. He

**WALKER**          C-55991          **CTF-CENTRAL**          3/9/99          **CJW**

WALKER, EUGENE
CDC NUMBER: C-55991
PAGE TWO

additionally noted that both of his parents assumed primary care for him, that he stayed
with his mother during the school period, and that he stayed with his father during sum-
mer vacations and on Easter. Mr. Walker stated that his current relationship with his
father is still good, but he hasn't talked with him in about a year. Inmate Walker said that
his relationship with his mother is still warm and supportive, that they call approximately
three times a year, and that she visits approximately two times a year. Inmate Walker re-
ported that he has five siblings. He said that he had two brothers, both of whom are now
deceased, one having died in a house fire when the inmate was very young, and the other
having died in 1976 in a gang related event. Mr. Walker further reported that he has three
sisters, one of whom is now deceased who also died in the earlier house fire. He noted
further that he has a younger sister who calls approximately one time a week, but she
does not visit. He has an older sister who calls approximately two times a month, who
writes periodically and visits approximately two times a year. Mr. Walker reported that
there is no history of significant crime or substance abuse in the family other than his
own.

## SECTION V:   PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION

This inmate reports being heterosexual. He denied any history of high risk sexual
behavior or sexual aggression.

## SECTION VI:  MARITAL HISTORY

Inmate Walker stated that he has never been married. However, he did say that he cur-
rently has a girlfriend who is 32 years old. He said that they met in 1993 while he was in
prison. He described their relationship as warm and supportive. She calls approximately
three times a week and visits two to three times a year and they write approximately twice
a month. Inmate Walker said that he has one step-daughter who is 9 years old from this
relationship. He said that his relationship with his step-daughter is warm, supportive, and
nonabusive.

## SECTION VII: MILITARY HISTORY

Inmate Walker denied any military history.

## SECTION VIII: EMPLOYMENT/INCOME HISTORY

Having been incarcerated since he was 19 years of age inmate Walker has a rather short
pre-incarceration work history. He reported that he worked for several months at the
USC Medical Center in Los Angeles as a janitor. However, inmate Walker does have a
long history of working in the California Department of Corrections. In 1992 Mr.

**WALKER**          **C-55991**          **CTF-CENTRAL**          **3/9/99**          **CJW**

WALKER, EUGENE
CDC NUMBER: C-55991
PAGE THREE

Walker completed the watch repair training course and was certified following 1200
hours of training. From 1993 to 1995, for 18 months, he worked in the butcher shop, and
from 1995 until 1997 inmate Walker said that he worked for three years in the wood shop
building furniture.

SECTION IX:   SUBSTANCE AND ABUSE HISTORY

Inmate Walker denied having a substance abuse history. However, he did note that in
1990 he completed the Substance Abuse Victory Education Program while at DVI. From
the medical records and from this inmate's report he does not appear to have a significant
drug abuse problem.

SECTION X:   PSYCHIATRIC AND MEDICAL HISTORY

Inmate Walker reported that in 1980 he was hospitalized for a short period for treatment
of gunshot wounds. He denied having any significant history of psychiatric hospitaliza-
tions, or any other serious accidents or head injuries, or a history of seizures or any other
neurological conditions. He disclosed no other significant medical problems and denied
any previous suicidal behavior.  He is currently not taking any medications.

SECTION XI:   PLANS IF GRANTED RELEASE

If granted parole inmate Walker intends to parole to Los Angeles County and live with
his girlfriend. He noted that he is skilled as a butcher and as a furniture maker and that he
is willing to take any employment to earn a wage following parole. His prognosis for
community living is positive.

SECTION XII:   CURRENT MENTAL STATUS/ TREATMENT NEEDS

During the clinical interview, inmate Walker was alert and oriented to person, place, and
time.  He was appropriately dressed and groomed.  His speech was articulate and contex-
tually meaningful. His behavior was appropriate to the setting. He demonstrated no evi-
dence of a mood or thought disorder.  In general his judgment appeared to be sound.

Current Diagnostic Impressions:

AXIS I:        No diagnosis.
AXIS II:       No diagnosis.
AXIS III:      No diagnosis.
AXIS IV:       Incarceration.

**WALKER**        C-55991        **CTF-CENTRAL**        3/9/99        **CJW**

WALKER, EUGENE
CDC NUMBER: C-55991
PAGE FOUR

AXIS V:       GAF = 90.

Previous treatment activities by this inmate include participation in several self-help pro-
grams. Inmate Walker reported that from 1992 until 1995 he participated for three years
in the Straight Life Program while at DVI. This program focused upon returning youth,
especially gang members, back to the community for successful adaptation. Additionally,
he reported that in 1998 he attended the Parenting Skills Group, a 12 week program
which he completed. Mr. Walker noted that he is not currently taking any self-help
programs and that while he desires to take these programs, none are currently available.

Inmate Walker demonstrated insight into his commitment offense. Moreover, his judg-
ment in general and specifically in regards to his commitment offense appear to be sound.
This inmate's prognosis is positive for being able to maintain his current mental state in
the community upon parole.

SECTION XIII:   REVIEW OF LIFE CRIME

Inmate Walker described the circumstances surrounding his commitment offense. While
he denied that he took a leadership role in this crime, he did note that, but for his acts, the
victim probably would not have been killed. When asked about his thoughts and feelings
regarding the crime he stated that he was very sorry. He evidenced understanding by des-
cribing the gradual increase of influence that his peers had on him as he gradually became
more deeply involved in the gang in East Los Angeles, noting that he entered the gang at
age 16. He expressed a moderate degree of remorse for his crime. His remorse and em-
pathy for the victim and his family appears to be appropriate and genuine.

SECTION XIV:   ASSESSMENT OF DANGEROUSNESS

A.     Inmate Walker's violence potential within a controlled setting is considered to be
       approximately less than the average inmate in this level two population. This
       conclusion is the result of consideration of several factors. On the one hand,
       inmate Walker did report that he has a prior juvenile criminal record wherein he
       was found guilty of receiving stolen property. Further, he admitted that he was a
       gang member in his youth beginning at the age of 16. Also, within CDC, in 1988
       inmate Walker was found guilty of destruction of state property and given a CDC
       115. In 1997 he was found guilty of disruptive behavior and received a CDC 115.
       In this last incident this inmate reported that while in the chow line, he refused a
       direct order. On the other hand, in neither of these instances was the inmate found
       guilty of violent actions of a physical nature. Moreover, this inmate has not been
       found guilty of any other violations in over 16 years of incarceration at CDC.

WALKER          C-55991          CTF-CENTRAL          3/9/99               CJW

WALKER, EUGENE
CDC NUMBER:  C-55991
PAGE FIVE

B.     If released to the community his violence potential is considered to be no more
than the average citizen in the community.

C.     There are no significant risk factors which may be precursors to violence for this
inmate.

SECTION XV: CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS

1.     Inmate Walker is competent and responsible for his behavior. He has the capacity
to abide by institutional standards and has generally done so during his incarcera-
tion period.

2.     This man does not have a mental health disorder which would necessitate treat-
ment either during his incarceration period or following parole.

3.     This inmate does not appear to have a significant drug or alcohol problem and
there are no recommendations in this area.


*[signature]*

**JOE REED, Ph.D., J.D.**
**Staff Psychologist**
**Correctional Training Facility, Soledad**


*[signature]*

**BRUCE BAKEMAN, Ph.D.**
**Senior Psychologist**
**Correctional Training Facility, Soledad**

JR:cjw

D:     3/3/99
T:     3/9/99


**WALKER          C-55991          CTF-CENTRAL          3/9/99          CJW**

# EXHIBIT 7

**BOARD OF PRISON TERMS**                                            STATE OF CALIFORNIA
**LIFE PRISONER HEARING DECISION FACE SHEET**

[ ] PAROLE GRANTED - (YES)
   CDC:  Do not release prisoner before
        Governor's review

[X] PAROLE DENIED - (NO)  *One (1) year*

| Records Use Only | | | |
|---|---|---|---|
| Parole Release Date | | | |
| | YR | MO | DAY |
| Attach Prison Calculation Sheet | | | |

[ ] AGREED UNSUITABLE (Attach 1001A Form) FOR:_____YEAR(S)
[ ] HEARING POSTPONED/REASON:_____

## PANEL RECOMMENDATIONS AND REQUESTS

**The Board Recommends:**

[ ] No more 115's or 128A's  [X] Stay discipline free
[ ] Work to reduce custody level  [ ] Learn a trade*  [X] Earn positive chronos
[X] Get self-help*  [ ] Get therapy*  [ ] Get a GED*

[ ] Recommend transfer to_____
[ ] Other_____
  *These programs are recommended if they are offered at your prison and you are eligible/able to participate.

**Penal Code 3042 Notices**   5-Nov-04

| Commitment Offense(s) | 187 | MURDER |
|---|---|---|
| | Code(s) | Crime(s) |
| | A374018 | 1 |
| | Case #(s) | Count #(s) |

| Date Inmate Came to CDC 11/9/82 | Date Life Term Began 11/9/82 | Minimum Eligible Parole Date 7/24/90 |
|---|---|---|
| [ ] Initial Hearing | [ X ] Subsequent (Hearing No.)_7_ | Date of Last Hearing_____ |

CDC Representative
Attorney for Prisoner    Address
D.A. Representative    County  LOS ANGELES

This form and the Board's decision at the end of the hearing is only _proposed_ and NOT FINAL. It will not become final until it is reviewed.

Chair _____  Date
Panel Member _____  Date
Panel Member _____  Date

LER, EUGENE   C-55991   CTF-SOLEDAD   DATE:  1/3/05 CAL:   Jan-05

54

1       CALIFORNIA BOARD OF PRISON TERMS

2                   D E C I S I O N

3           DEPUTY COMMISSIONER BLONIEN:  We are back on

4       record.

5           PRESIDING COMMISSIONER WELCH:  Mr. Walker,

6       we have a decision.  The Panel reviewed all the

7       information and relied on the following

8       circumstances in concluding that you, the prisoner,

9       is not suitable for parole and would pose an

10      unreasonable risk of danger to society or a threat

11      to public safety if released from prison.  Now this

12      is going to be a one-year denial.  The reason for

13      the denial is, one, the offense was carried out in

14      an especially cruel and callous manner.  And the

15      crime that you committed along with your crime

16      partners is the kind of crime that shock the

17      conscience of any people (inaudible) go out and

18      just navigate the city or the community, where

19      folks can't go to a certain area of the city.  Like

20      being in a third-world country.  Those kind of

21      crimes in a country like ours when they happen it

22      just shocks the community (inaudible).  Multiple

23      victims were attacked.  As you know, one was

24      killed.  The offense was carried out in a

25      dispassionate and calculated manner.  Certainly the

26      victim was abused.  The victims were abused.

27      EUGENE WALKER  C-55991      DECISION PAGE 1  1/03/05

55

1    Probably the money that they had on them was taken.

2    They were beaten, one stabbed.  The offense was

3    carried out in a manner that demonstrates a total

4    callous disregard for one's fellow man.  Shows that

5    you had no sense of what it means to be a part of

6    the community, or what it means to be a good

7    citizen.  More to the point, what it means to let

8    other folks in the community exist in a peaceful

9    kind of coexistence.  The conclusion was drawn from

10   the Statement of Facts wherein on 11/26/1981 the

11   Garcia brothers and two friends -- their car ran

12   out of gas near the Estrada Housing Project, and

13   they were attacked by you and your crime partners

14   with sticks, guns, assaulted, knives.  And as a

15   result Mr. Jesus Garcia, age 25, lost his life.

16   The other victims was robbed of their money.  They

17   were beaten.  You did have an escalating pattern of

18   conduct.  You had a history of violent (inaudible)

19   behavior.  You failed previous grants of probation.

20   You failed to profit from society's previous

21   attempts to correct your criminality.  Under

22   unstable social history, certainly one of the more

23   unstable factors were the folks that you associated

24   with, the gang that you associated with.  Certainly

25   that was an unstable social factor.  And there may

26   have been some family dynamics that you testified

27   **EUGENE WALKER  C-55991      DECISION PAGE 2  1/03/05**

56

```
1    to today that was unstable.  Certainly losing a

2    brother by violent means, by gang activity.

3    Certainly that was an unstable social factor that

4    you had to deal with.  Since your last hearing, you

5    have programmed.  You've been involved in self-help

6    programs.  Recent psychological report by

7    Dr. Macomber is an excellent psychological

8    evaluation.  It shows that you've made progress,

9    shows that your level of dangerousness in a

10   structured environment, according to Dr. Macomber,

11   is average compared to the average inmate.  And if

12   you're released to the community, he says then

13   maybe less than an average citizen in the

14   community.  So certainly from that perspective it

15   was a good psychological evaluation.  So we're not

16   requesting a new psychological evaluation, since

17   you are receiving a one-year denial.  Parole plans,

18   you do have parole plans.  You have a place to live

19   with your mom.  There's at least a couple of job

20   offers I saw in there.  You have lots of family

21   support in the community.  The Hearing Panel notes

22   that in response to Penal Code 3042 notices

23   indicate an opposition to a finding of suitable.

24   Specifically, the Deputy District Attorney from Los

25   Angeles spoke in strong opposition to a finding of

26   suitability at this time.  The Panel makes the

27   EUGENE WALKER  C-55991      DECISION PAGE 3  1/03/05
```

57

1   following findings:  The Panel finds that you need

2   to continue on the path that you are on.  You need

3   to continue to participate in positive kinds of

4   programs, self-help programs, and other kinds of

5   programs that will enable you to be able to face,

6   discuss, understand, and cope with stressful

7   situations in a nondestructive manner.  There are

8   some things we want to commend you for.  Self-help

9   programs that you participated in, Prison

10  Industries.  Certainly that's (inaudible).  We also

11  want to commend you for the family support that you

12  have in the community.  You haven't received a

13  disciplinary in seven years now.  Certainly that's

14  in your favor.  However, those positive aspects of

15  your behavior does not outweigh the factors of

16  unsuitability.  So your parole is going to be

17  denied for one year as I previously mentioned.

18  We're recommending that you remain disciplinary-

19  free.  That includes not even a 128 write-up.  That

20  you continue to participate in positive kinds of

21  programs, whether it's a work incentive program

22  through Prison Industries or vocational programs,

23  self-help programs, all of those kinds of programs.

24  We recommend that you participate in those programs

25  if they're available to you.  And that pretty much

26  concludes the reading of the decision.

27  **EUGENE WALKER  C-55991      DECISION PAGE 4  1/03/05**

58

1    Commissioner, do you have any comments?

2         DEPUTY COMMISSIONER BLONIEN:   No.   I wish

3    you good luck.

4         INMATE WALKER:   Okay.   Thank you.

5         PRESIDING COMMISSIONER WELCH:   Good luck to

6    you, Mr. Walker.

7         INMATE WALKER:   Happy New Year.   Have a nice

8    day.

9                         --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23   PAROLE DENIED ONE YEAR

24   THIS DECISION WILL BE FINAL ON:_____MAY - 3 2005_____.

25   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   EUGENE WALKER   C-55991     DECISION PAGE 5   1/03/05

59

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, APRIL ALLEN, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 58, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of EUGENE WALKER, CDC No. C-55991, on JANUARY 3, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated January 21, 2005, at Sacramento County, California.

April Allen
Transcriber
**CAPITOL ELECTRONIC REPORTING**

# EXHIBIT 8

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS



**INMATE COPY**

In the matter of the Life )
Term Parole Consideration )
Hearing of:               )     CDC Number C-55991
                          )
EUGENE WALKER             )
_____)


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JULY 13, 2006

1:30 P.M.


PANEL PRESENT:

Mr. Michael Porter, Presiding Commissioner
Mr. Dennis, Deputy Commissioner

OTHERS PRESENT:

Mr. Eugene Walker, Inmate
Ms. Katera E. Rutledge, Attorney for Inmate
Mr. Paul Turley, Deputy District Attorney, L.A. County
Correctional Officers, Unidentified


CORRECTIONS TO THE DECISION HAVE BEEN MADE
_____   No     See Review of Hearing
_____   Yes    Transcript Memorandum


**Stephanie Strothers,
Northern California Court Reporters**

ii

## INDEX

PAGE

Proceedings ............................................... 1

Case Factors .......................................... 12

Pre-Commitment Factors ................................ 17

Post-Commitment Factors .............................. 36

Parole Plans ......................................... 47

Closing Statements ................................... 64

Recess ............................................... 71

Decision ............................................. 72

Adjournment .......................................... 79

Transcriber Certification ............................ 80

--oOo--

1

| 1 | **P R O C E E D I N G S** |
|---|---|
| 2 | **PRESIDING COMISSIONER DAVIS:**  This is a |
| 3 | Subsequent Parole Consideration Hearing for |
| 4 | Mr. Eugene Walker, CDC number C55991.  Today's |
| 5 | date is July 13, 2006.  We're located at the |
| 6 | Correctional Training Facility.  The inmate was |
| 7 | received on November 9, 1982, from Los Angeles |
| 8 | County.  The life term began on November 9, 1982, |
| 9 | and the minimum eligible parole date is July 22, |
| 10 | 1990.  The controlling offense for which the |
| 11 | inmate has been committed is murder second, Case |
| 12 | number A374018, Count 1, Penal Code section 187. |
| 13 | Second with an additional count of one Count of |
| 14 | Burglary, 4593C (Inaudible) County, Case number |
| 15 | 8369470, Count 1.  The inmate received a term of |
| 16 | 15 years to life.  This hearing is being tape- |
| 17 | recorded and for the purposes of voice |
| 18 | identification, we'll each state our first and |
| 19 | last names, spelling the last name.  When it |
| 20 | reaches you, Mr. Walker, if you'll also give us |
| 21 | your CDC number please, sir.  So, I will start |
| 22 | with my left is James Davis, D-A-V-I-S, |
| 23 | Commissioner. |
| 24 | **DEPUTY COMMISSIONER SMITH:**  My name's |
| 25 | Dennis Smith, S-M-I-T-H.  I'm a Deputy |
| 26 | Commissioner. |
| 27 | **DEPUTY DISTRICT ATTORNEY TURLEY:**  Paul |

2

1    Turley, T-U-R-L-E-Y, Deputy D.A., Los Angeles

2    County.

3         **ATTORNEY RUTLEDGE:**  Katera E. Rutledge, R-

4    U-T-L-E-D-G-E, Attorney for Mr. Walker.

5         **INMATE WALKER:**  Eugene Walker, W-A-L-K-E-

6    R.

7         **PRESIDING COMMISSIONER DAVIS:**  And your

8    CDC number?

9         **INMATE WALKER:**  C55991.

10         **PRESIDING COMMISSIONER DAVIS:**  Thank you.

11    Let the record also reflect we're joined by two

12    correctional officers here today who are here for

13    security purposes only and will not be actively

14    participating in the hearing.  Excuse me, Mr.

15    Walker, in front of you underneath the papers

16    that you have there is a laminated piece of paper

17    with the American for Disabilities Act.  Could

18    you please read that aloud for us, sir?

19         **INMATE WALKER:**  "American

20              Disabilities Act - The American

21              Disabilities Act.  ADA is a law to

22              help people with disabilities.

23              Disabilities are problems that make

24              it hard for some people to see,

25              hear, breathe, talk, walk, learn,

26              think, work, or take care of

27              themselves than it is for others.

3

1        Nobody can be kept out of public

2        places or activities because of a

3        disability.  If you have a

4        disability, you have the right to

5        ask for help to get ready for your

6        BPT Hearing, get to the hearing,

7        talk, read forms and papers, and

8        understand the hearing process.

9        BPT will look at what you asked for

10       to make sure you have a disability

11       that is covered by the ADA and that

12       you have asked for the right kind

13       of help.  If you do not get help or

14       if you don't think you got the kind

15       of help you need, ask for a BPT

16       1074 Grievance Form, so you can get

17       help.  'You can also get help to

18       fill it out.'"

19       **PRESIDING COMMISSIONER DAVIS:**  Great,

20  thank you.  Mr.(Inaudible)?

21       **DEPUTY COMMISSIONER SMITH:**  And you were

22  able to read that without glasses?

23       **INMATE WALKER:**  Yes, I'm a little nervous,

24  excuse me.

25       **DEPUTY COMMISSIONER SMITH:**  That's all

26  right.  You're doing fine.  I'd tell you to

27  relax, but that's like saying go see the white

4

1    elephant in the room.   (Inaudible) if that's what

2    you pictured, so do your best, you'll be fine.

3    But you don't wear glasses?

4          **INMATE WALKER:**  No, I do not.

5          **DEPUTY COMMISSIONER SMITH:**  Good for you

6    and you're able to hear me all right?

7          **INMATE WALKER:**  Yes, I can.

8          **DEPUTY COMMISSIONER SMITH:**  And you made

9    it here under your own steam today?

10         **INMATE WALKER:**  Yes, I did.

11         **DEPUTY COMMISSIONER SMITH:**  You're healthy

12   and ready to go?  Good for you.

13         **INMATE WALKER:**  Thank you.  Together with

14   the staff from the institution on September 7,

15   2005, you reviewed and signed a BPT Form 1073,

16   indicating you do not have any disabilities that

17   would qualify under the Americans with

18   Disabilities Act.  Is that correct, sir?

19         **INMATE WALKER:**  Yes, sir.

20         **DEPUTY COMMISSIONER SMITH:**  And is there

21   any reason that can think of that you would not

22   be able to actively participate in this hearing

23   today?

24         **INMATE WALKER:**  No.

25         **DEPUTY COMMISSIONER SMITH:**  All right and

26   Counsel you're satisfied with that?

27         **ATTORNEY RUTLEDGE:**  Yes, sir.

5

1      **PRESIDING COMMISSIONER DAVIS:**  All right.

2   This hearing is being conducted pursuant to Penal

3   Code sections 3041 and 3042, and the Rules and

4   Regulations of the Board of Prison Terms

5   (Inaudible) Parole Consideration Hearing of life

6   inmates.  The purpose of today's hearing is to

7   once again consider the number and nature of the

8   crimes for which you were committed, your prior

9   criminal and social history and your behavior and

10  programming since your commitment.  We've had had

11  the opportunity to review your Central File and

12  your prior transcript and you will be given an

13  opportunity to correct or clarify the record as

14  we proceed.  We will reach a decision today and

15  inform you of whether or not we find you suitable

16  for parole and the reasons for our decision.  If

17  you are not found suitable for parole or if you

18  are found suitable for parole the length of

19  confinement will be explained to you.  Nothing

20  that happens in today's hearing will change the

21  findings of the court.  The Panel is not here to

22  retry your case.  We're here for the sole purpose

23  of determining your suitability for parole.  Do

24  you understand that?

25      **INMATE WALKER:**  Yes, sir.

26      **PRESIDING COMMISSIONER DAVIS:**  The

27  hearing will be conducted in two phases.  First,

6

 1   I will discuss with you the crimes with which you
 2   are committed as well as your prior criminal and
 3   social history.  Mr. Smith will discuss your
 4   progress, your counselor and psychological
 5   evaluations and your parole plans as well as any
 6   letters of support or opposition as they may
 7   exist.  Once that concludes, the Commissioners,
 8   the District Attorney, and your attorney will
 9   have the opportunity to ask you questions.  The
10   questions that come from the District Attorney
11   will be asked to the Chair then you will respond
12   back to the Panel with your answer.  Next the
13   District Attorney, then your attorney and then
14   finally you will be given an opportunity to make
15   a final closing statement.  Your statement, sir,
16   should focus on why you believe you are suitable
17   for parole.  The California Code of Regulations
18   states that regardless of time served a life
19   inmate shall be found unsuitable for and denied
20   parole if in the judgment of the Panel the inmate
21   would pose an unreasonable risk of danger to
22   society if released.  You have certain rights.
23   Those rights include the right to a timely notice
24   of this hearing and the right to review your
25   Central File, as well as the right to present
26   relevant documents.  Counselor, are you satisfied
27   that your client's rights have been met to date?

7

1      **ATTORNEY RUTLEDGE:**  Yes.

2      **PRESIDING COMMISSIONER DAVIS:**  You also

3  have additional right and that is to be heard by

4  an impartial Panel.  Now, you've heard

5  Commissioner Smith and I introduce ourselves

6  today.  Do you have any reason to believe that we

7  would not be impartial?

8      **INMATE WALKER:**  No, I do not.

9      **PRESIDING COMMISSIONER DAVIS:**  All right.

10  Now, you will receive a written copy of our

11  tentative decision today.  That decision becomes

12  effective in 120 days.  The copy of the decision

13  and a copy of the transcript will be sent to you.

14  You are not required to admit your offense or

15  discuss your offense; however, this Panel does

16  accept the findings of the court to be true.  Do

17  you understand that?

18      **INMATE WALKER:**  Yes, sir.

19      **PRESIDING COMMISSIONER DAVIS:**  The Board

20  has (Inaudible) appeal process.  If you disagree

21  with any thing in today's hearing you have the

22  right to go directly to court with your

23  complaint.  Commissioner Smith, are we going to

24  be going over anything from your confidential

25  file today?

26      **DEPUTY COMMISSIONER SMITH:**  No, we will

27  not.

8

1    **PRESIDING COMMISSIONER DAVIS:**  All right.

2    I'm passing a checklist of the documents to both

3    Counsel.  If you will take a look at that,

4    please, and make sure we're all operating on the

5    same list of documents.

6    **ATTORNEY RUTLEDGE:**  Thank you.  We have

7    the documents except for the confidential stuff.

8    **DEPUTY DISTRICT ATTORNEY TURLEY:**  Yes.

9    **PRESIDING COMMISSIONER DAVIS:**  (Inaudible)

10    That'll be marked Exhibit one then?  Are there

11    any additional documents you would like us to

12    consider today, Counselor?

13    **ATTORNEY RUTLEDGE:**  Yes, sir, I do have a

14    stack of letters that are both - they're parole

15    plan letters, job offers and general support

16    letters.

17    **PRESIDING COMMISSIONER DAVIS:**  All right.

18    Thank you again officer.  All right, we will

19    review those at the appropriate time.  Any

20    preliminary objections?

21    **ATTORNEY RUTLEDGE:**  No, we'll just note

22    for the record, that Mr. Walker's hearing is

23    late.

24    **PRESIDING COMMISSIONER DAVIS:**  All right

25    and did you want to describe for us how late?

26    **ATTORNEY RUTLEDGE:**  Sure, I believe he was

27    denied parole for one year in January of '05, and

9

1    so he would be about six months late.

2             **PRESIDING COMMISSIONER DAVIS:**  That's

3    fine.  The (Inaudible) for the lack of hearings

4    (Inaudible), so that's what we'll do today.  And

5    it is the goal certainly to do them time from now

6    on, so I hope that happens in the future.  We

7    will work to do everything we can to make sure

8    that happens. (Inaudible)  The only decision we

9    make today, we are, of course, a long ways from

10   making any sort of decision along way from that,

11   but for all other (Inaudible) we will do our best

12   to get these on time.

13            **DEPUTY DISTRICT ATTORNEY TURLEY:**

14   Counselor(Inaudible)--

15            **PRESIDING COMMISSIONER DAVIS:**  (Inaudible)

16            **DEPUTY DISTRICT ATTORNEY TURLEY:**  May I

17   ask many of these letters are dated in 2005?

18            **ATTORNEY RUTLEDGE:**  That's because his

19   hearing was supposed to be in January, so dated

20   December.  They're since his last hearing.

21            **DEPUTY DISTRICT ATTORNEY TURLEY:**  Right,

22   well why haven't they been submitted before now?

23            **INMATE WALKER:**  Pardon?

24            **DEPUTY DISTRICT ATTORNEY TURLEY:**  Why have

25   they not been placed in the C-File and submitted

26   before now?

27            **INMATE WALKER:**  Well, in the past I've

10

1  placed in my C-File and then when I came to my

2  hearings the letters weren't here because the

3  counselor had - they had got tied up, so from

4  that time on I've always kept them in front of

5  myself to make sure that they arrived here.

6      **DEPUTY DISTRICT ATTORNEY TURLEY:**  Okay,

7  there's also some letters that do not have any

8  dates on them.   Some handwritten letters?

9      **INMATE WALKER:**  Pardon?

10     **DEPUTY DISTRICT ATTORNEY TURLEY:**  That

11 have no dates.

12     **INMATE WALKER:**  Oh, I have the envelopes

13 that initially came; however, I just took them

14 out so it would be more convenient for you.

15     **DEPUTY DISTRICT ATTORNEY TURLEY:**  Okay

16 what I'm going to - we're going to take a short

17 recess, so that I have some time to go through

18 these letters.  I'm not going to do them while

19 the rest of the hearing's going on.  Secondly,

20 I'm going to return these handwritten letters to

21 Counsel.  If you'll show the Counsel the

22 corresponding envelopes, so that she note on

23 these letters appropriate dates.  I'm not going

24 to do that function for you.  It'll be just a few

25 minutes and we'll call you back in.

26     **INMATE WALKER:**  Okay.

27                 [Recess]

11

1    **DEPUTY DISTRICT ATTORNEY TURLEY:**  Everyone
2  previously identified is back from the hearing
3  room.  I appreciate everyone's cooperation with
4  giving an adequate amount of time to go read the
5  letters that we are going to provided.
6    **PRESIDING COMMISSIONER DAVIS:**  Any other
7  documents, Counsel?
8    **ATTORNEY RUTLEDGE:**  Yes, we have another
9  stack of letters.  John's getting (Inaudible).
10    **DEPUTY DISTRICT ATTORNEY TURLEY:**  That
11  would be fine.  Be happy to review everything
12  that --
13    **ATTORNEY RUTLEDGE:**  (Laugh)  Nope, that's
14  going to be it.
15    **DEPUTY DISTRICT ATTORNEY TURLEY:**  That Mr.
16  Walker would have available for me.
17    **PRESIDING COMMISSIONER DAVIS:**  I don't
18  know if I remember if I asked this or not, but do
19  we have any preliminary objections?
20    **ATTORNEY RUTLEDGE:**  No, sir, we already
21  noted for the record.
22    **PRESIDING COMMISSIONER DAVIS:**  (Inaudible)
23  the timing of this issue, okay.
24    **ATTORNEY RUTLEDGE:**  Correct.
25    **PRESIDING COMMISSIONER DAVIS:**  And will
26  Mr. Walker be speaking with us today?
27    **ATTORNEY RUTLEDGE:**  Mr. Walker will speak

12

1   on all issues other than the commitment offense.

2        **PRESIDING COMMISSIONER DAVIS:**  All right,

3   Mr. Walker, for all other issues I'll go ahead

4   and swear you in.  If you raise your right hand,

5   please.  Do you solemnly swear or affirm to

6   testify you will give this hearing be the truth

7   and nothing but the truth?

8        **INMATE WALKER:**  Yes, I do.

9        **PRESIDING COMMISSIONER DAVIS:**  Okay.

10  Going to incorporate by reference the Parole

11  Officer's report pages 5 thru 12, and then for a

12  summary of the crime refer to the January 2006

13  calendar starting on page 1, Item A1, 'Your

14  Summary of Crime,' where it states:

15           "On 11/26/81, at about 2:30 A.M.,

16           the victim, Jesus Garcia, G-A-R-C-

17           I-A, was in a car with his brother,

18           Rosario Garcia, same spelling, and

19           two friends, Alejandro Leora,

20           LEORA, and Alfreda Gonzales, G-O-N-

21           Z-A-L-E-S.  The car had run out of

22           gas in the area of Lorena and

23           Olympic Boulevard near Estrada

24           Housing Project.  At that location,

25           they were attacked by a group of

26           young males described as Latinos

27           and one Black.  They used knives,

13

1     sticks and a gun at everyone in the

2     car.  All of the victims were

3     pulled from the vehicle and were

4     beaten and robbed.  The victim,

5     Alejandro Gonzales, surrendered his

6     wallet containing two hundred

7     dollars and two of the group then

8     tried to stab him.  He managed to

9     flee.  As he was running he heard

10    two shots fired and heard bullets

11    hit the ground next to him and

12    heard someone yell out, 'if you

13    come back to your car, we'll kill

14    you.'  He sustained a superficial

15    abrasion to his abdomen.  Victim,

16    Rosario Garcia, stated that he was

17    pulled out of the car by two

18    members of the group and stabbed in

19    the back.  He surrendered his

20    wallet containing one hundred and

21    eighty dollars, as well as a

22    woman's watch.  He received

23    treatment for multiple lacerations

24    and stab wounds to the face and

25    extremities and abdomen.  Victim,

26    Alejandro Lorena, confirmed that

27    his wallet contained eighty dollars

14

1    was taken.  He was hit across the
2    face with a stick.  After he fell
3    to the ground, he was beaten and
4    kicked and then one of the
5    assailants jumped on him trying to
6    break his leg.  He was treated for
7    multiple contusions to the face,
8    fractured nose and a badly sprained
9    ankle.  Victim, Jesus Garcia, was
10   stabbed at the scene and died as a
11   result of multiple stab wounds and
12   I believe that was actually 12 in
13   all to the chest, one of which,
14   severed the carotid artery and one
15   of which penetrated his heart.
16   Investigations revealed that Eugene
17   Snooky, that's 'S-N-O-O-K-Y',
18   Walker guy, Shelby, S-H-E-L-B-Y,
19   and Johnny 'Lumpy, L-U-M-P-Y,'
20   Guhardo, G-U-H-A-R-D-O, and Frank
21   'S-L-E-E-P-Y,' Castro, CASTRO,
22   members of VNE.  That's V-N-E, an
23   Estrada Housing Project gang
24   committed the robbery and the
25   murder.  Investigating officers and
26   Detective Miller of the Hollenbeck
27   Station noted that Walker, the only

15

1          adult in the group, was the

2          instigator in the murder and

3          robberies.  Walker was originally

4          charged with one count of 187 PC

5          (Murder and (Inaudible) Robbery)

6          with special allegations pursuant

7          to 190.2(a)(17) PC Count 1, 211 PC

8          (Robbery with Great Bodily Injury)

9          pursuant to 22.7 PC, Counts 2, 3,

10         and 4, and 5, and 664/187 PC

11         (Attempted Murder with a Deadly

12         Weapon/A Knife with Great Bodily

13         Injury) pursuant to (Inaudible)

14         Code section 22.7 PC.  Count 6,

15         verdict was rendered as a result of

16         a plea of guilty to Count 1 with

17         the remaining counts dismissed at

18         the interest of justice."

19    And this was taken from the (Inaudible) Parole

20    Officer, report pages 1, 6 through 8, and 2.  The

21    prisoner's version is on the Page 2 of the 2006

22    January calendar Board report under item two,

23    'Prisoner's Version.'

24         "In an interview in his report

25         Walker stated that he had expressed

26         his remorse for his actions.  He

27         admitted participation in the

16

1      robbery, but denied his involvement

2      in murder.  He reported the he had

3      been standing by a bonfire in

4      Estrada Courts with a friend when

5      two other friends who had gone to

6      get some wood before the fire ran

7      out and said they had just robbed

8      two guys and showed them some

9      money.  Walker said his friends

10     grabbed some sticks from the fire

11     and ran over to the crime scene and

12     demanded the money from the two

13     victims.  The victims stated they

14     didn't have any more money.  One of

15     Walker's companions called the

16     victims liars and the VNE members,

17     that's V-N-E, members began to

18     assault the victims.  They noticed

19     that the other victim in the car

20     and demanded money from them.  One

21     of the victims escaped by running

22     away.  Walker denied stabbing or

23     shooting anyone, but did admit that

24     he assaulted the victim with a

25     stick.  He denies hearing or seeing

26     anyone being stabbed or shot.

27     Additionally, Walker stated that

17

```
 1            the VNE (which Walker reports
 2            stands for (Inaudible) Nueva
 3            Estrada) was too amorphous to have
 4            a leader or even a gang structure."
 5    As always, Counsel, if your client would like to
 6    change (Inaudible) at anytime comment or talk
 7    about the commitment offense he's certainly
 8    welcome to do so; however, we understand and
 9    appreciate the fact that he has the absolute
10    right not to do so.
11            ATTORNEY RUTLEDGE:   I believe he accepts
12    that version of the events.   He accepts that.
13            PRESIDING COMMISSIONER DAVIS:   The
14    versions that I read (Inaudible) your version?
15            ATTORNEY RUTLEDGE:   Yes.
16            PRESIDING COMMISSIONER DAVIS:   Okay.
17    Under social history it indicates that you were
18    an only child.   This is from the probationer
19    officer's report that you were an only child,
20    that you were born in Los Angeles, that prior to
21    your arrest that you were living with your
22    mother.   It says you didn't get along with the
23    guys.   What does that mean?
24            INMATE WALKER:   Meaning I'm not the only
25    child.
26            PRESIDING COMMISSIONER DAVIS:   Okay, not
27    the only child?
```

18

1        INMATE WALKER:  No.

2        PRESIDING COMMISSIONER DAVIS:  That's

3   good.   I appreciate you bringing that up because

4   I would have mentioned that at some point.   If

5   any of this now and we're into this it if you

6   want to comment or you want to correct anything,

7   please feel free to do so.

8        INMATE WALKER:  Yes.

9        PRESIDING COMMISSIONER DAVIS:  So, you

10  have brothers?

11       INMATE WALKER:  I have - well, I have a

12  brother who is resting in peace and I have an

13  older sister and a younger sister.

14       PRESIDING COMMISSIONER DAVIS:  Okay and

15  your brother died when?

16       INMATE WALKER:  In 1976 when I was 13.

17       PRESIDING COMMISSIONER DAVIS:  And how did

18  he pass away.

19       INMATE WALKER:  He was shot at a party by

20  a gang member.

21       PRESIDING COMMISSIONER DAVIS:  And your

22  sister how's she doing?

23       INMATE WALKER:  She's doing fine.

24       PRESIDING COMMISSIONER DAVIS:  Do you keep

25  in contact with her?

26       INMATE WALKER:  Yes, I do.

27       PRESIDING COMMISSIONER DAVIS:  Good,

19

1   through letters and telephone calls?

2          INMATE WALKER:  Yes, I have one of the

3   support letters from Deborah Wyndham.  That's my

4   sister.

5          PRESIDING COMMISSIONER DAVIS:  Okay.

6          INMATE WALKER:  And my youngest sister I

7   think she moved to Colorado.  I haven't been able

8   to catch up with her lately.

9          PRESIDING COMMISSIONER DAVIS:  Okay.  You

10  were living with your mother prior to the arrest?

11         INMATE WALKER:  Yes.

12         PRESIDING COMMISSIONER DAVIS:  And the

13  fact that you dropped out of school at age 17.  I

14  don't know if that's related to the part about

15  not getting along with the guys.  What was that

16  about?

17         INMATE WALKER:  Well, from where I lived

18  to get to school I had to go through another area

19  and because I lived in a housing project, they -

20  it was considered that anybody from over there

21  was from that gang in that area.  So, I couldn't

22  get to school, so I stopped going.

23         PRESIDING COMMISSIONER DAVIS:  You had to

24  go through a rival gang's territory to get to

25  school?

26         INMATE WALKER:  Yes.

27         PRESIDING COMMISSIONER DAVIS:    What did

20

1    you do when you dropped out?

2          INMATE WALKER:  I went to continuation.  I

3    worked odd jobs.

4          PRESIDING COMMISSIONER DAVIS:  Said you

5    started night school in November of 1981?

6          INMATE WALKER:  Yes.

7          PRESIDING COMMISSIONER DAVIS:  And did you

8    finish your night school?

9          INMATE WALKER:  No, I did not.

10          PRESIDING COMMISSIONER DAVIS:  How come?

11          INMATE WALKER:  I started – I believe I

12    started working at L.A. County U.S.D. Medical

13    Center.

14          PRESIDING COMMISSIONER DAVIS:  Okay, what

15    did you do for them?

16          INMATE WALKER:  I was just a maintenance

17    worker.

18          PRESIDING COMMISSIONER DAVIS:  And how

19    long did you hold that job?

20          INMATE WALKER:  I held that until I was

21    arrested I believe.

22          PRESIDING COMMISSIONER DAVIS:  Did you

23    enjoy your work there?

24          INMATE WALKER:  Yes.

25          PRESIDING COMMISSIONER DAVIS:  You never

26    married and no children?  Now, you did have some

27    other jobs during the summer?

21

1      **INMATE WALKER:**  Yes, I painted murals

2  around the area because we were trying to get rid

3  of all the graffiti writing and things of that

4  nature and we also - they also had us do the

5  elderly in the neighborhood.  They had us clean

6  their yards and help them out with odd-jobs

7  throughout and it was just to keep the youth I

8  guess out of trouble and keep them involved in

9  something.

10      **PRESIDING COMMISSIONER DAVIS:**  So, was it

11  kind of a Job Corps kind of a program or?

12      **INMATE WALKER:**  It's kind of, yeah, like a

13  I don't know.  This is one way that I can explain

14  it.  They had like a cedar program (Inaudible).

15      **PRESIDING COMMISSIONER DAVIS:**  (Inaudible)

16      **INMATE WALKER:**  Yeah, cedar program to

17  keep people - to keep the at-risk youth and --

18      **PRESIDING COMMISSIONER DAVIS:**  And a way

19  to get you started?

20      **INMATE WALKER:**  Right.

21      **PRESIDING COMMISSIONER DAVIS:**  Right.

22      **INMATE WALKER:**  It could give you a chance

23  to get in the workforce and understand what

24  that's all about.

25      **PRESIDING COMMISSIONER DAVIS:**  So, painted

26  murals?

27      **INMATE WALKER:**  Painted murals all around

22

1  East Los Angeles and around the Estrada Court

2  Housing Project.

3       **PRESIDING COMMISSIONER DAVIS:**  So, you

4  have some talent, in that regard?

5       **INMATE WALKER:**  A little.

6       **PRESIDING COMMISSIONER DAVIS:**  A little,

7  yeah.  Did you find by painting the murals

8  (Inaudible) going back and covering them over

9  again (Inaudible)?

10      **INMATE WALKER:**  Well, actually I had an

11  incident where someone came and we were painting

12  over it and they said don't.  Hey, man, that's my

13  name.  That's and we said well we're trying to

14  eliminate that from here and someone had to come

15  and mediate the situation and we got it resolved,

16  but we were just trying to make sure make the

17  neighborhood look better.

18      **PRESIDING COMMISSIONER DAVIS:**  And how –

19  I'm sorry, how long did you do that?

20      **INMATE WALKER:**  I did that every summer

21  from the age of 13 'til I was 18.

22      **PRESIDING COMMISSIONER DAVIS:**  And how did

23  you get involved in the gangs?

24      **INMATE WALKER:**  Well, after my brother was

25  killed in 1976, I continued.  I was really active

26  in sports and things of that nature and then

27  because we had to travel so far to the other

23

1   schools, when I started getting lumped in with

2   hey you're from over there, you must be from over

3   there.  No, no, no I'm not from over there I just

4   play sports because I would get caught after

5   school playing sports at the school as opposed to

6   going home and being gone, so when the gang

7   members arrived at the school grounds after the

8   school was out there I was.  And so, the guy

9   started telling me hey man you want to be

10   careful.  I don't know if you want to stick

11   around after school because those guys will

12   probably come through again, so gradually I

13   stopped doing it and as I stopped doing that it

14   made it seem more like they were right in

15   hindsight.  I'm looking at this in hindsight.

16          **PRESIDING COMMISSIONER DAVIS:**  Sure, yeah.

17          **INMATE WALKER:**  I'm realizing that if I

18   would have stood my consistency saying that I

19   wasn't involved and showing my face there every

20   day they perhaps would have believed that as

21   opposed to me stop coming around.  Oh, we were

22   right, we pressured this guy.  We were right.

23   And then from that point on, I started hanging

24   with the wrong crowd, leaving after school, going

25   with the guys because we traveled about at least

26   14, 15 blocks get to school, so a lot of us would

27   because we're coming from the housing project

24

1    walk to school together.  Therein, we also got

2    lumped in together with the other gang members.

3    From that point on, I got closer and closer with

4    the gang members and was accepted as one of the

5    gang members.

6         PRESIDING COMMISSIONER DAVIS:  Now, the

7    gang that you belonged to was it a mixed race

8    gang?

9         INMATE WALKER:  No, it was predominately,

10   Hispanic.  There was just a few Blacks and a

11   couple of Whites.

12        PRESIDING COMMISSIONER DAVIS:  Okay and

13   you indicated that there was no real structure?

14        INMATE WALKER:  No, there was no real

15   structure involved at all.  Once again in

16   hindsight now that I look at it and go, no, there

17   was none.  I mean nobody told you what to do;

18   however - well no one told us what not to do.

19   They would try, you know, every blue moon

20   somebody would say man you don't want to do this

21   or you don't want to do that, but there was no

22   structure at all.

23        PRESIDING COMMISSIONER DAVIS:  Were did --

24   where would you place yourself in age among the

25   group that you were with?  Were you in fact one

26   of the older ones in the group?

27        INMATE WALKER:  Actually, I wasn't.

25

1   Actually, a lot of the older guys were I grew up

2   around some of them, playing sports and this and

3   that, and we were all around the same ages

4   actually.

5            PRESIDING COMMISSIONER DAVIS:   Okay and

6   you experimented with marijuana?  You say you

7   tried it a few times?

8            INMATE WALKER:      Yeah, I tried it a

9   couple of times, but because I had always been an

10  athlete, I didn't like the way it altered my

11  thinking or my state of mind.

12           PRESIDING COMMISSIONER DAVIS:   Okay, no

13  other drugs?

14           INMATE WALKER:  No.

15           PRESIDING COMMISSIONER DAVIS:   You say you

16  were an athlete, what kind of sports did you

17  participate in?

18           INMATE WALKER:  Baseball, football,

19  basketball, soccer, hand-ball.

20           PRESIDING COMMISSIONER DAVIS:   Organized

21  sports or just kind of?

22           INMATE WALKER:  Organized sports –

23           PRESIDING COMMISSIONER DAVIS:   Yeah.

24           INMATE WALKER:  Track.  I ran a lot of

25  track then.

26           PRESIDING COMMISSIONER DAVIS:   And you

27  also drank two, six-packs of beer a week?

26

1        **INMATE WALKER:**  No, I mean there would be

2    two six-packs of beer there.

3        **PRESIDING COMMISSIONER DAVIS:**  All right.

4        **INMATE WALKER:**  For everybody and I'd have

5    a couple of beers here or there, but once again

6    I'd leave there and go to the gym and I'd feel

7    the sloshing around of the beer in my stomach, so

8    I really kind of cutback on that as well.  You

9    know I mean I was drinking I'd guess about two or

10    three beers a week and I just didn't like my mind

11    to be altered like that, so I gave that up.

12        **PRESIDING COMMISSIONER DAVIS:**  Okay, so

13    that's the substance - the alcohol and drugs

14    really weren't a big part of your life?

15        **INMATE WALKER:**  No, no.

16        **PRESIDING COMMISSIONER DAVIS:**  But you

17    were back then a member of the VNE Gang.  Was

18    there an initiation process for this gang?

19        **INMATE WALKER:**  Well, me, because I had

20    lived there for so long, no.

21        **PRESIDING COMMISSIONER DAVIS:**  No?

22        **INMATE WALKER:**  But there were for a lot

23    of other people.

24        **PRESIDING COMMISSIONER DAVIS:**  Was it the

25    usual jumping in --

26        **INMATE WALKER:**  Yeah.

27        **PRESIDING COMMISSIONER DAVIS:**  Sort of

27

1   process?  Arrested by L.A. P.D. and in 05/03/79,

2   for burglary.  You were counseled and released?

3   Actually, for receiving stolen property.  I'm

4   sorry, after receiving stolen property.  On

5   07/30/79, for burglary.  Probation was requested

6   and placed on supervision.  This burglary

7   involved you and another person climb a fence

8   into a business and removed some boxes and

9   merchandise from the yard.

10          **INMATE WALKER**:  Yes.

11          **PRESIDING COMMISSIONER DAVIS**:  And what

12   happened as a result of that, do you remember?

13          **INMATE WALKER**:  I believe I was put on

14   probation for that.

15          **PRESIDING COMISSIONER DAVIS**:  Okay.

16          **INMATE WALKER**:  Six months probation I

17   think.

18          **PRESIDING COMISSIONER DAVIS**:  And in '80

19   you were arrested again by L.A. P.D. for burglary

20   and this count was held abeyance for a 07/02/80,

21   arrest for a robbery in which the victim of the

22   offense was a 14-year old male who was accosted

23   by the defendant and other gang members who had

24   knocked him off his bicycle.  Defendant

25   approached him and kicked him in the forehead

26   while the boy was still laying on the ground and

27   took his bicycle and rode off towards the Estrada

28

1   Courts.  However, I believe your version of that

2   was that you simply helped him up.

3        **INMATE WALKER:**  Well, I took the bicycle.

4        **PRESIDING COMMISSIONER DAVIS:**  Okay, you

5   did.

6        **INMATE WALKER:**  I then - actually this

7   because I was with a couple of guys.  They go hey

8   that guy's some rival gang.  I was like, oh,

9   really.  They ran and knocked him off his bike.

10       **PRESIDING COMISSIONER DAVIS:**  Okay.

11       **INMATE WALKER:**  I jumped on it, rode off.

12  Later on it was pointed out that I was the guy

13  that beat him up and took his bike.  I just --

14       **PRESIDING COMMISSIONER DAVIS:**  Were the

15  other two guys Hispanic that were there?

16       **INMATE WALKER:**  Yes, sir.

17       **PRESIDING COMMISSIONER DAVIS:**  Is there

18  anything about your prior history prior to coming

19  to the institution?  Your family life, your

20  involvement in drugs, with the gangs, your

21  participation in work and so forth?  Anything

22  that you feel is important for this Panel to

23  understand we have not already talked about?

24       **INMATE WALKER:**  Well, yes, in fact, in

25  hindsight because now I have to do a lot of

26  (Inaudible).

27       **ATTORNEY RUTLEDGE:**   (Inaudible)

29

1       **INMATE WALKER:**  And try to figure out
2   where I went wrong and when I went wrong.  I
3   realized after my brother got killed because my
4   brother was - because my mom and dad were
5   separated, so my brother was the disciplinarian
6   and the father figure in the home so to speak and
7   I realized shortly after that that that's where I
8   went wrong.  That's where I started thinking that
9   I could make my decisions on my own and do my own
10  thing and that I was grown and (Inaudible) I
11  found out I was wrong, but shortly after that I
12  started running with the wrong crowd, thinking
13  that I could do what I wanted to do, and my mom
14  would tell me listen you're making these
15  decisions and look at where it's getting you.
16  You know, my mom tried to do what she could.  I
17  understand that, but me being and thinking that I
18  knew it all at 15, 16, or, yeah, and so on I
19  didn't know anything.  But I realized there was
20  an opportunity for me to take a different route;
21  however, being that I was an immature, weak and
22  not necessarily having the skills or the
23  rationale to make those changes I never did and
24  that's one of the things that I continue to work
25  on today.
26      **PRESIDING COMMISSIONER DAVIS:**  Okay.  All
27  right, good, I appreciate that.  Any questions

30

1   Commissioner?

2           **DEPUTY COMMISSIONER SMITH:**

3     I had to do a lot of (Inaudible).  I'm trying

4   to figure out where I went wrong and when I went

5   wrong and that was after my brother left work,

6   because my brother was, my momma and dad were

7   separated so my brother was the disciplinarian

8   and the Father figure in the home, so to speak.

9   And I realized shortly after that, that that's

10  where I went wrong.  That's where I started

11  thinking I make my decisions on my own and do my

12  own thing and that I would and boy I found out I

13  was wrong, but shortly after that I started

14  running with the wrong crowd, thinking I could

15  do, what I wanted to do.  My Momma would tell me,

16  'listen you are making decisions and look where

17  it's getting you?'  You know, my Mom tried to do

18  what she could, I understand that, but me being

19  and thinking that I knew it all at fifteen,

20  sixteen or so on, I don't know anything, but I

21  realize there was opportunities for me to take a

22  different route, however, being that I was a

23  immature and weak or not, not necessarily having

24  the skills or the rational to make those changes,

25  I never did.  And that is one of those things I

26  continue to work on today.

27          **PRESIDING COMISSIONER DAVIS:**  All right.

31

1   Good, I appreciate that.  Any questions

2   Commissioner?

3         **DEPUTY COMMISSIONER SMITH:**  The question

4   regarding your involvement with the Inaudible)

5   gang.  You indicated that you haven't been

6   involved in that organization or that group

7   since you've come to prison?

8         **INMATE WALKER:**  Since day one.  Since the

9   commitment offense.

10        **DEPUTY COMMISSIONER SMITH:**  And you

11  reviewed your C-File, is that right?

12        **INMATE WALKER:**  Yes.

13        **DEPUTY COMMISSIONER SMITH:**  Did you review

14  the form that's commonly referred to as the A12?

15        **INMATE WALKER:**  No, I don't know

16  (Inaudible).

17        **DEPUTY COMMISSIONER SMITH:**  Well, the A12

18  is the form issued by the institution to validate

19  individuals as either members or associate's

20  gangs.

21        **INMATE WALKER:**  Uh-huh.

22        **DEPUTY COMMISSIONER SMITH:**  And the last

23  entry, which is dated January 13th of this year

24  validates you as a continuing member of the

25  (Inaudible) Estrada Gang.

26        **ATTORNEY RUTLEDGE:**  Nuevo (Inaudible)?

27        **INMATE WALKER:**  Nuevo.

32

1        **DEPUTY COMMISSIONER SMITH:**   Nuevo.   So, I

2   am confused.   How is it that on the one hand you

3   can tell us that you have had no involvement of

4   any kind since you've come into the institution

5   and on the other hand there's a document that

6   validates you as a continuing member of that

7   organization?

8        **INMATE WALKER:**   Well, my only reason - my

9   only thinking for that would be because I came in

10  here as a gang member I am still considered by

11  staff and everybody as a gang member.   However,

12  all my activities since I came in have been

13  totally against that.   I even have the gang

14  tattoos on me, but I do not participate.   I have

15  not been in any fights concerning anything like

16  that.   Any acts of violence since this commitment

17  offense.   I, in fact, I've taken upon myself to

18  make sure that everybody and what I realize is

19  like I spoke earlier about my consistency.   You

20  need to show consistency for people to believe

21  that you're not involved, so over the years

22  that's one of the things I did.   I've associated

23  with everyone; speak to everyone from every race.

24  I and I want them - because I want them to see

25  the consistency that I'm not involved in any

26  gang.   The only reason I don't have these tattoos

27  covered up is because it's a - I can get a

33

1  disciplinary action for getting tattoos covered

2  up otherwise I would.

3       DEPUTY COMMISSIONER SMITH:  Have you

4  participated in the de-briefing process?

5       INMATE WALKER:  No.

6       DEPUTY COMMISSIONER SMITH:  Why?

7       INMATE WALKER:  I have never been asked to

8  participate in it.  Usually that's - I guess when

9  you're in administrative segregation or

10  something.

11       DEPUTY COMMISSIONER SMITH:  Or when you

12  continue to be a validated gang member and you'd

13  like to get that changed.

14       INMATE WALKER:  They have no means for us

15  to go in and asked to get de-briefed, honestly.

16  I have never heard of anything like that.

17       DEPUTY COMMISSIONER SMITH:  Okay, any

18  follow up points.

19       PRESIDING COMISSIONER DAVIS:  No, any - no

20  other questions?

21       INMATE WALKER:  No.

22       PRESIDING COMISSIONER DAVIS:  All

23  right(Inaudible).

24       DEPUTY COMMISSIONER SMITH:  Mr. Walker

25  according to the C-File you received by the

26  Department of Corrections on August 13th, 1984,

27  received here at CTF January 3rd, 1995, you have

34

1  a classification score of 19, which is the lowest
2  classification score that a life inmate can
3  attain.   Your last hearing was held on January 3,
4  2005.   That was your seventh subsequent hearing
5  and you received a one-year denial at that time.
6  Since you have been incarcerated, you've had a
7  generally positive disciplinary history, although
8  you have had 18, CDC128's, the last one being in
9  April of '96, and you've had 12, CDC115's, the
10  last one being December of 1997.   So, it appears
11  it was the latter part of the 1990's when you
12  started to change some attitude and turn yourself
13  around?
14         **INMATE WALKER**:   Well, actually I turned
15  myself around in 1989.   However, I received the
16  115 in '97 when I was in (Inaudible), but in '89,
17  that's where I made the turn around, honestly,
18  and I just had a little time to sit and think for
19  myself and I knew that I didn't want to go that
20  way so the only way for me to go was the right
21  way and from that point on I tried to live my
22  life accordingly.   To and be more considerate,
23  more open and I started working on myself a whole
24  lot more, reading a whole lot more to find out
25  exactly the root of all my problems and where I
26  went wrong and how I can correct them.
27         **DEPUTY COMMISSIONER SMITH**:   Thank you.

35

1    You have a certificate of completion is dated

2    February 2006, for completing Anger Management?

3        **INMATE WALKER:**  Yes, sir.

4        **DEPUTY COMMISSIONER SMITH:**  Certificate of

5    Recognition regarding your completion of 15 video

6    reports.  Was that part of the inmate

7    employability program?

8        **INMATE WALKER:**  No, no the video reports

9    is something that comes on your weekly at the

10   institution.

11       **DEPUTY COMMISSIONER SMITH:**  Okay, so

12   that's --

13       **INMATE WALKER:**  That's.

14       **DEPUTY COMMISSIONER SMITH:**  That is a

15   separate program then?  And then you have

16   (Inaudible) chrono that's dated April of this

17   year for your participation in the inmate

18   employability program and that also has a series

19   of videos as well, correct?

20       **INMATE WALKER:**  Yes.

21       **DEPUTY COMMISSIONER SMITH:**  Okay, about

22   how many series was in that program that you

23   completed?

24       **INMATE WALKER:**  Of the --

25       **DEPUTY COMMISSIONER SMITH:**  Inmate

26   employability?

27       **INMATE WALKER:**  I believe three.

36

1           **DEPUTY COMMISSIONER SMITH:**   Three, okay.

2           **INMATE WALKER:**   One by Carl Rigg of the

3    Oregon Police Academy and another one by --

4           **ATTORNEY RUTLEDGE:**   Which (Inaudible)?

5           **INMATE WALKER:**   The anger.   It's anger.

6           **ATTORNEY RUTLEDGE:**   I think (Inaudible)

7    for the chrono in there.

8           **DEPUTY COMMISSIONER SMITH:**   Yeah, there

9    is.

10          **ATTORNEY RUTLEDGE:**   (Inaudible)

11          **INMATE WALKER:**   Yeah and it's just to

12   teach you about your actions because your actions

13   have - your beliefs have consequences.   You see.

14   I mean so a lot of people get emotional and over

15   the years I've worked on not reacting, just

16   listening.   There's nothing wrong (Inaudible)

17   talking and I've come to realize that (Inaudible)

18   works a whole lot better and the only way for me

19   to get home was to change.   So, back in '89, once

20   I went through the Straight Life Program I - that

21   opened me up to a whole different way of living.

22          **DEPUTY COMMISSIONER SMITH:**   Thank you.

23   You've had four (Inaudible) chronos for your

24   participation in Narcotics Anonymous.

25          **INMATE WALKER:**   Uh-huh.

26          **DEPUTY COMMISSIONER SMITH:**   In March of

27   '05, June of '05, January of '06, and April of

37

1    '06.

2            **INMATE WALKER:**  Uh-huh.

3            **DEPUTY COMMISSIONER SMITH:**  If you

4    received a parole date would you continue to

5    participate in Narcotics Anonymous in the

6    community?

7            **INMATE WALKER:**  Yes, I would try to.  I

8    contacted them and they have an open-door policy.

9    Their thing is you get out, you come here, so I

10   had my mom - I'm having my mom checking

11   (Inaudible) what's closest to (Inaudible) to see

12   what's available.

13           **DEPUTY COMMISSIONER SMITH:**  But, why will

14   you continually participate in that program?

15           **INMATE WALKER:**  Well, because there's a

16   lot of things that I can learn from other

17   peoples' drugs.  I mean me, myself, I never was

18   really into drugs, but I found out - usually I

19   thought if someone was a I don't know how they

20   got started on drugs, you know, but I found out

21   that different people from different walks of

22   life got involved with drugs for different

23   things; for divorces, for women for miscarriages

24   (Inaudible) their jobs.  There's several

25   different people from different walks of life

26   that drugs lead you to that problem that would

27   lead you to drugs and what I try to do is take

38

1   their experiences so that I don't have to

2   experience the drug life at all.

3           **DEPUTY COMMISSIONER SMITH:**  Okay, thank

4   you.

5           **INMATE WALKER:**  You're welcome.

6           **DEPUTY COMMISSIONER SMITH:**  And there's

7   also a laudatory chrono that's dated February of

8   2006, for your completing The Healing, The Angry

9   Heart --

10          **INMATE WALKER:**  Yes.

11          **DEPUTY COMMISSIONER SMITH:**  Video series.

12  Another anger management program that you

13  completed, received a laudatory chrono and that

14  was in October of 2005.  You've been assigned to

15  P.I.A., as a furniture assembler, is that still

16  current?

17          **INMATE WALKER:**  Yes, sir.

18          **DEPUTY COMMISSIONER SMITH:**  And you have

19  received satisfactory to above average to

20  exceptional reports consistently in that

21  assignment.  Before I go to the psychological

22  evaluation, dated July 16, 2004, prepared by Dr.

23  Macomber, M-A-C-O-M-B-E-R, are there any other

24  activities that you have been involved in since

25  your last hearing that I haven't addressed?

26          **INMATE WALKER:**  No, I believe you've

27  addressed them all.

39

1      **DEPUTY COMMISSIONER SMITH:** Okay, Mr.

2  Walker, should something come to mind --

3      **INMATE WALKER:** Uh-huh.

4      **DEPUTY COMMISSIONER SMITH:** Before we go

5  to recess let me know so that we can get that on

6  the record and we can be, you know, have

7  knowledge of that.

8      **INMATE WALKER:** Okay.

9      **DEPUTY COMMISSIONER SMITH:** You know I

10  don't want to be just good at documenting the

11  negatives.  I want to make sure I've documented

12  all the positives (Inaudible) we go out.

13      **ATTORNEY RUTLEDGE:** (Inaudible) report?

14      **DEPUTY COMMISSIONER SMITH:** Pardon?

15      **ATTORNEY RUTLEDGE:** Work reports?

16      **INMATE WALKER:** My work reports.  I don't

17  have them with me.  I believe they're on my file.

18      **PRESIDING COMMISSIONER DAVIS:** Right and

19  they've all been satisfactory to above average to

20  exceptional.

21      **INMATE WALKER:** Yes, yes.  I mean like I

22  say I have worked odd jobs prior to coming to

23  prison but being involved in P.I.A. is a little

24  different then because it's changing a lot more.

25  They're opening us up to a lot of different

26  things and a lot of stuff that I've never had

27  access to like computers.  You know, they have

40

1    engineering jobs over there that are really

2    interesting and I am trying to get involved in

3    one of those as well.

4            **DEPUTY COMMISSIONER SMITH:**  The

5    psychological evaluation, again as I indicated,

6    is dated in July 2004.  It is certainly positive

7    because as old as it is it would have been used

8    in your trial hearing.  I'm going to identify or

9    address only a couple of segments in the report

10   that I think are most pertinent in that if you or

11   counsel would like any other sections addressed

12   or have any comments on the evaluation, I will

13   certainly give you the opportunity.

14           **ATTORNEY RUTLEDGE:**  Okay.

15           **DEPUTY COMMISSIONER SMITH:**  Moving to page

16   two, under current diagnostic impressions, under

17   Axis-1, 2 and 3, there are no clinical

18   personality or physical disorders.  Axis 4,

19   there's stress as a result of a life term

20   incarceration and that is a standard diagnostic

21   impression that's applied to all life prisoners

22   and you have under Axis 5, current global

23   assessment functioning score of 90.  That's

24   relatively high.  That's based on a scale of zero

25   to a hundred.  Under assessment of dangerousness,

26   the doctor writes that in considering your

27   violence potential within the institutional

41

1  environment your patter of disciplinary shows

2  that when you were initially placed in the

3  institution that you were young and immature,

4  rebellious and impulsive.  You probably agree

5  with that?

6          **INMATE WALKER**:  Yes, I do.

7          **DEPUTY COMMISSIONER SMITH**:  And that,

8  however, you've since shown a great deal of

9  maturity in perception and good judgment and, as

10  a result, you're potential for dangerous behavior

11  in the institution is  considered to be

12  definitely below average.  In considering the

13  dangerousness potential when released on parole,

14  the doctor writes that the same comments that

15  were made regarding institutional violence seem

16  to be appropriate and that you do not pose a risk

17  to the community.  Your violence potential is no

18  more than that of the average citizen in the

19  community and, in fact, based on some of the

20  lessons that you've learned, your potential for

21  violence may be even less than that of the

22  average citizen.  And then under observations and

23  recommendations, the doctor writes that there are

24  no mental or emotional problems that would

25  interfere with parole considerations at this

26  time.  Any comments or any other sections that

27  either one of you would like to address before I

42

1    go to Inaudible)?

2        **ATTORNEY RUTLEDGE:**  Yes, thank you.  In –

3    on page one in the last paragraph under current

4    mental status treatment, needs – in considering

5    the current diagnostic classification that would

6    be appropriate it is evident that when this

7    inmate was arrested at the age of 19, he's

8    certainly met the criteria of a history of

9    conduct disorder, as well as anti-social behavior

10   in thinking.  However, he has gone through some

11   serious life changing experiences while

12   incarcerated.  His thinking at this time is pro-

13   social.  He has feelings of empathy and concern

14   toward others.  As a result there is no evidence

15   of personality disorder or other psychopathology

16   at this point in time.  Now, on page two, section

17   twelve, it's like the last paragraph of section

18   twelve, it's – he, the psychiatrist is referring

19   to a program that Mr. Walker did at DDI for three

20   years called Straight Life and it was about him

21   working with some youths, juvenile youths, and he

22   writes:

23        "INMATE WALKER was very successful

24        in confronting these delinquent

25        youths.  Some of them very highly

26        entrenched in their peer groups and

27        lifestyle.  He enthusiastically

43

1           reported that several hard-core

2           youths changed their life patterns,

3           which he learned about when he

4           attended the annual banquet.  They

5           had dropped out of their gangs,

6           concluded their G.E.D.'s and were

7           on their way to a law-abiding life.

8           This had a dramatic impact on

9           INMATE WALKER.  He plans on

10          continuing to work with delinquent

11          youths in the community when he is

12          paroled.  His enthusiasm for this

13          project is sincere and genuine.  He

14          would be an excellent role model

15          for this type of program."

16      **ATTORNEY RUTLEDGE:**  (Inaudible)

17      **DEPUTY COMMISSIONER SMITH:**  Yes.  And let

18  me note for the record my participation in that

19  program was from 1992 to 1995.

20      **INMATE WALKER:**  Yes, that program is like

21  I said 1989.  I got to that institution in 1989

22  and was - I wasn't - I didn't get officially

23  entered into the program until 1992, '93.

24  However, it was at that time that I realized I

25  went through this sort of metamorphosis.  This

26  understanding the direction I wanted my life to

27  go in and it was through that program because I

44

1    realized - well, what happens when you are in
2    here doing this time, there's nobody on your
3    shoulder saying you're a good person because in
4    most cases you're not, so it sits on the
5    individual.  Fine, what is self-work?  So, when I
6    got involved in that program I had an idea what
7    it was about but until I got involved with it and
8    seen that I was able to help and had something to
9    contribute to the lives of these youths and I was
10   able to see myself in them and I - and, first,
11   because, the odd thing about it was in this
12   program these kids had more respect than they had
13   for their parents and their parents are sitting
14   in the same room, and I found that really odd.  I
15   mean even involved in the things I did on the
16   street, which weren't positive, I still respected
17   my parents.  These kids had no respect for their
18   parents and they would sit there and say this in
19   front.  I said well I (Inaudible) speaking to
20   these kids I was able to make a connection and
21   see that I was able to help them and in hindsight
22   I realized how much they were helping me.  They
23   were helping me understand that if I open up and
24   spoke and allowed them to see who I was and see
25   that hey you don't have to go down this road
26   because if you do this is who you are going to
27   be.  I can see them opening up seeing this and

45

1   that touched me deeply, you know, because from

2   the time I was arrested until then I had never

3   been affected by anything like that, and these

4   were total strangers, but they were kids and they

5   needed help and I could see in their parents'

6   faces I have a mom, I have a dad, and I know that

7   they were suffering, you know, and I know the

8   suffering that I caused and I could see their

9   parents were suffering.  So, to be able to

10  contribute to their lives and help them, help -

11  if only help one, it made me feel great and that

12  program catapulted me even further in changing

13  myself and trying to change those around me, to

14  think more positively and to strive to be the

15  best person that they could possibly be, which I

16  continue to try to do today.

17          **DEPUTY COMMISSIONER SMITH:**  Thank you.

18  We'll refer back to the Board Report of January

19  2006, regarding your parole plans.  Indicates

20  that you plan on residing with your mother,

21  Mattie Walker, in Lynnwood, California?

22          **INMATE WALKER:**  Yes, sir.

23          **DEPUTY COMMISSIONER SMITH:**  And that upon

24  release you'd seek employment either as a butcher

25  or watch repairman or a furniture assembler?

26          **INMATE WALKER:**  Yes, sir.

27          **DEPUTY COMMISSIONER SMITH:**  Is that still

46

1    accurate?

2            **INMATE WALKER:**  Yes, sir.

3            **DEPUTY COMMISSIONER SMITH:**  Okay and we

4    have a number of letters that you have submitted

5    and I'd appreciate you submitting them and as I

6    indicated I appreciate your cooperation in

7    letting me go off the record, so that I had a

8    chance to read the letters in detail and not just

9    to skim over the top of them.  Letter from your

10   mother is dated November 16, 2005, very positive

11   handwritten letter from her.  She talks about

12   your upbringing and the relationship that the two

13   of you have had throughout your life.  She is

14   very supportive of you being granted a parole

15   date today and getting back in the community.

16   She indicates that she will, once you are

17   paroled, she will continue to support you in

18   every way that she can and that she offers you

19   her home as a place for you to reside.  How old

20   is your mother now?

21           **INMATE WALKER:**  My mother's 70-years old.

22           **DEPUTY COMMISSIONER SMITH:**  Okay and does

23   she live a home, apart, a condo?

24           **INMATE WALKER:**  Apartment.

25           **DEPUTY COMMISSIONER SMITH:**  An apartment?

26           **INMATE WALKER:**  Yes, sir.

27           **DEPUTY COMMISSIONER SMITH:**  And do you

47

1  know how large the apartment is?

2          INMATE WALKER:  I've seen pictures of it,

3  but I have no way of knowing.

4          DEPUTY COMMISSIONER SMITH:  It's a two-

5  bedroom apartment?

6          INMATE WALKER:  (Inaudible)

7          DEPUTY COMMISSIONER SMITH:  Okay and does

8  she live there alone?

9          INMATE WALKER:  Yes.

10          DEPUTY COMMISSIONER SMITH:  Okay.  I have

11  a letter from Reuben Vasquez, V-A-S-Q-U-E-Z,

12  friend of yours and both he and his family have

13  known you since you were in grammar school.

14          INMATE WALKER:  Uh-hmm.

15          DEPUTY COMMISSIONER SMITH:  He operates

16  several meat markets and bakeries and I know I'm

17  going to mispronounce this Le Mixteca, M-I-X—T-E-

18  C-A, Cordillerase, C-O-R-D-I-L-L-E-R-A-S-E,

19  Panaderias (phonetic).

20          INMATE WALKER:  (Inaudible)

21          DEPUTY COMMISSIONER SMITH:  Thank you.  P-

22  A-N-A-D-E-R-I-A-S, which he helps manage, as well

23  as the family owning them.  Indicates that he

24  would be happy to offer you employment at one of

25  the establishments, indicating that you achieved

26  the butcher vocation.

27          INMATE WALKER:  Uh-hmm.

48

1      **DEPUTY COMMISSIONER SMITH:**  Which you

2  have.  In talking with Mr. Vasquez has he been –

3  any conversation been specific as to whether you

4  be employed as a butcher or be employed as a

5  baker or which one of these businesses you'd be

6  located?

7      **INMATE WALKER:**  Well – no, what happened –

8  well, what happens – well, from my conversations

9  with him they are both connected.  It's a –

10  there's a butcher department here and there's a

11  bakery right over here.

12      **DEPUTY COMMISSIONER SMITH:**  In the same

13  building?

14      **INMATE WALKER:**  Yeah, like in a

15  supermarket; in one supermarket.

16      **DEPUTY COMMISSIONER SMITH:**  Okay, so they

17  talked about several markets and bakeries.  It

18  gives me the impression that, you know, perhaps

19  there are a number of different locations over

20  talking one single location where both the meat

21  shop and the bakery are combined in one building?

22      **INMATE WALKER:**  In a couple of business

23  establishments, yes.

24      **DEPUTY COMMISSIONER SMITH:**  Okay.

25      **INMATE WALKER:**  In other ones they are

26  individualized (Inaudible).

27      **DEPUTY COMMISSIONER SMITH:**  Has he

49

1   indicated hours, salary, anything like that at

2   all?

3            **INMATE WALKER:**  Unfortunately, he hasn't.

4            **DEPUTY COMMISSIONER SMITH:**  Okay, that's

5   good enough on that conversation (Inaudible).

6   Another letter from Jimmy Valenzuela, V-A-L-E-N-

7   Z-U-E-L-A, been long time friends.  Known you for

8   more than 20 years?

9            **INMATE WALKER:**  Yes.

10           **DEPUTY COMMISSIONER SMITH:**  Known your

11  family as well?  Writes a very positive, very

12  supportive and strongly recommends that you be

13  granted parole and indicates that he would

14  support you in any way that he can.  Letter from

15  Jose Rosales, R-O-S-A-L-E-S, also a friend that

16  who's married long-term, employed.  His wife is

17  employed and has known you since grammar school?

18           **INMATE WALKER:**  Yes, sir.

19           **DEPUTY COMMISSIONER SMITH:**  Letter

20  supports you being granted parole at this time

21  and he would assist you in obtaining employment,

22  as well as support you in the community in any

23  way that he and his wife can.  A letter from

24  Vicky Escutia.

25           **INMATE WALKER:**  Yes.

26           **DEPUTY COMMISSIONER SMITH:**  I actually

27  pronounced that right?

50

1          INMATE WALKER:  Yes.

2          DEPUTY COMMISSIONER SMITH:  Finally got

3     one.

4          INMATE WALKER:  Yes.

5          DEPUTY COMMISSIONER SMITH:  E-S-C-U-T-I-A.

6     She's writing you again.  She's written on your

7     behalf in the past.  She's a longtime friend.

8     Apparently you grew up in the same apartment

9     complex --

10          INMATE WALKER:  Yes.

11          DEPUTY COMMISSIONER SMITH:  -- together.

12     She believes that you've paid your debt, that you

13     deserve to be paroled to the community and that

14     while on parole you can count on her, her family,

15     other friends, your godson, as well as others to

16     help you gain employment and to establish

17     yourself in the community.  Another letter from

18     your sister, Deborah Windom, W-I-N-D-O-M.

19          INMATE WALKER:  Yes.

20          DEPUTY COMMISSIONER SMITH:  And that's

21     postmarked 12/27/05.  It's a handwritten letter,

22     a very positive letter.  Unfortunately, it's

23     printed so I had no trouble reading it.  In the

24     hopes that you'll be granted a parole date that

25     both she, your mother, as well as other friends

26     and family members in that area will support you

27     in your parole both with residents, financial

51

1   support and any other needs you may have, and

2   then the last letter is from Alonzo Hanzy, H-A-N-

3   Z-Y?

4          **INMATE WALKER:**  Yes, sir.

5          **DEPUTY COMMISSIONER SMITH:**  And that's

6   postmarked 12/20/05.  He begins by identifying

7   himself as your brother, but as I got into the

8   letter it appears that he was your cellmate?

9          **INMATE WALKER:**  Well --

10         **DEPUTY COMMISSIONER SMITH:**  But

11  (Inaudible).

12         **INMATE WALKER:**  Excuse me.

13         **DEPUTY COMMISSIONER SMITH:**  Okay.

14         **INMATE WALKER:**  I lived in a dormitory

15  (Inaudible).  We lived in the dormitory for at

16  one time.

17         **DEPUTY COMMISSIONER SMITH:**  Okay.  So,

18  it's not a blood relation?

19         **INMATE WALKER:**  No.

20         **DEPUTY COMMISSIONER SMITH:**  (Inaudible) as

21  a brother, but --

22         **INMATE WALKER:**  (Inaudible)

23         **DEPUTY COMMISSIONER SMITH:**  -- but

24  certainly he considers himself to be your

25  brother?

26         **INMATE WALKER:**  Yeah, I was an older

27  brother figure to him in here.

52

1      **DEPUTY COMMISSIONER SMITH:**   And certainly

2    in some cases a relationship, a brother, is where

3    two people choose to have that relationship and

4    be stronger when one is simply a blood situation

5    and you've had no choice.   He writes a roughly

6    two and a half page letter.   Talks about how he

7    met you.

8      **INMATE WALKER:**   Yes.

9      **DEPUTY COMMISSIONER SMITH:**   The positive

10    effect you had on his own adjustment --

11      **INMATE WALKER:**   Uh-hmm.

12      **DEPUTY COMMISSIONER SMITH:**   -- in the

13    institution prior to him being released on parole

14    and that, you know, anything he and his family

15    can do to support you, he would be very happy to

16    do.   It was a very, very positive letter as well.

17    Before I return to Commissioner Davis, are there

18    any other comments that you or counsel would like

19    to make regarding your parole plans?

20      **INMATE WALKER:**   Yes, I (Inaudible), my

21    apologies; however, one of these letters my mom

22    is specific about where I'll be living.   I mean

23    the room I live in, what's available to me, the

24    transportation and I'm not sure if I handed that

25    over, and --

26      **PRESIDING COMMISSIONER DAVIS:**   If you have

27    another letter I'd be more than happy to review.

53

1    **INMATE WALKER:**  Okay and it says - it's
2    more in detail than the one that I handed in and
3    it's up-to-date; it's more up-to-date.  However,
4    I have so many letters in this - I don't want to
5    take up a lot of or too much time.

6    **PRESIDING COMMISSIONER DAVIS:**  We have all
7    the - this hearing has to do with whether you're
8    going to be granted a parole date or not.  We're
9    not in a rush.

10    **INMATE WALKER:**  Okay, let's see where I
11    have it here.

12    **ATTORNEY RUTLEDGE:**  I think his mom writes
13    him a parole support --

14

15    **INMATE WALKER:**  Yes.

16    **ATTORNEY RUTLEDGE:**  -- every couple months
17    --

18    **INMATE WALKER:**  Yes.

19    **ATTORNEY RUTLEDGE:**  -- just in case his
20    hearing comes.

21    **INMATE WALKER:**  Yeah, my mom writes me.

22    **ATTORNEY RUTLEDGE:**  (Laugh)

23    **INMATE WALKER:**  Yeah, we've been counseled
24    in the past, so my mom oh, my God.

25    **PRESIDING COMMISSIONER DAVIS:**  Okay, why
26    don't we go off the record for just a minute
27    while you do your search, then we'll come back on

54

1   so you don't feel the pressure of us speaking on

2   the tape?

3         INMATE WALKER:   I don't think I have it.

4   I don't think I have it.

5         PRESIDING COMMISSIONER DAVIS:   Okay.

6         INMATE WALKER:   Because I would have put

7   that in there.

8         PRESIDING COMMISSIONER DAVIS:   Okay, if

9   during the recess you should come across it let

10  one of the officers know and they can bring it in

11  and we'll consider it.

12        INMATE WALKER:   Okay.

13        PRESIDING COMMISSIONER DAVIS:   All right.

14        INMATE WALKER:   Thank you.

15        PRESIDING COMMISSIONER DAVIS:

16  Commissioner?

17        DEPUTY COMMISSIONER SMITH:   Thank you.

18  Tell me a couple things that you have learned in

19  your anger management or your AA programs that

20  make you a different person from the person who

21  committed the crime?

22        INMATE WALKER:   Well, my Anger Management

23  taught me about my emotions and because your

24  emotions are what drive you but it's your - well,

25  your beliefs are what drive you, but your

26  emotions are what make you act.  You act usually

27  - in the past I acted emotionally without

55

1    thinking even in the commitment of things.     I
2    didn't have the rationale to - I was so young and
3    immature that I didn't have the rationale to stop
4    the thing; however, that's what I've worked on
5    since 19, at least since 1989.     Is to be able to
6    and I got this from all the programs because most
7    of the programs that I've taken to where if I'm
8    not - what I came to realize is a lot of them are
9    just common sense and if you applied just basic
10   commonsense it'd teach - you would go a whole lot
11   further and so I started to just stop and think
12   and be more considerate of other people.     That's
13   what all of these programs taught me.     They
14   taught me to just sit back, think about, you
15   know, what you want to do and be considerate of
16   other peoples' feelings and views.     My - over the
17   years I learned to say things the way I wanted to
18   hear them because, you know, because a lot of
19   times you say things and it rubs someone the
20   wrong way and I've been rubbed the wrong way in
21   the past as well.     So, what I wanted to do was
22   make sure that I learned how to speak to people
23   and not bruise their feelings.     Just so that the
24   conversation could flow and then I learned to
25   agree to disagree.     I mean we don't have to agree
26   on everything.     Just because I - just because we
27   don't agree doesn't mean that we can't come to an

56

1  understanding or at least I can, you know.

2      PRESIDING COMMISSIONER DAVIS:  As late as

3  '97, you received a 115 for disruptive behavior,

4  what was that about?

5      INMATE WALKER:  I was on my - I was in my

6  - I lived in the dormitory and it held about 350

7  people and I was on my way to chow to go eat and

8  the officer on the podium said that I cut in line

9  for chow and I tried to tell him I don't - that's

10 one of the things that I do not do not do.  In

11 here I consider myself kind of old school because

12 I've been in here for so long, so one of the

13 things I try to do is operate on respect and

14 cutting in line is disrespectful, so the officer

15 said that I had cut in line for chow.  I tried to

16 tell him I didn't, I wouldn't and from that --

17     PRESIDING COMMISSIONER DAVIS:  Uh-hmm.

18     INMATE WALKER:  It became a little

19 disruptive because it wasn't just me that he

20 accused it of.  He accused a couple of other

21 people and some of them got a little voictrous.

22 I tried to tell them to, you know, quiet down

23 because it's a dormitory.  There are a lot of

24 people and people get emotional real quick and

25 this guy had a job to do and the more people

26 talking at one time the more it seems like it is

27 an out of control situation and from that the

57

1  problems blew up into what you see there.

2         **PRESIDING COMMISSIONER DAVIS:**  Okay.  How

3  did you actually stay out of the gang activity

4  when you came in prison?

5         **DEPUTY COMMISSIONER SMITH:**  Commissioner,

6  may I?

7         **PRESIDING COMMISSIONER DAVIS:**  Sure.

8         **DEPUTY COMMISSIONER SMITH:**  According to

9  the 115 it's similar to what Mr. Walker

10  described; however the 115 indicates that it was

11  Mr. Walker and five other individuals, a total of

12  six, you know, all of who cut in the line --

13        **PRESIDING COMMISSIONER DAVIS:**  Uh-hmm.

14        **DEPUTY COMMISSIONER SMITH:**  -- together as

15  a group.  Not you as an individual and others

16  followed, but there were six of you together that

17  broke into that line and when the officer ordered

18  you and the others out of the line all six of you

19  refused that direct order.

20        **INMATE WALKER:**  Well.

21        **DEPUTY COMMISSIONER SMITH:**  So, that's

22  just --

23        **INMATE WALKER:**  (Inaudible)

24        **DEPUTY COMMISSIONER SMITH:**  What the 115's

25  (Inaudible) and I just --

26        **INMATE WALKER:**  (Inaudible) to respond to

27  that I was waiting.  In the dorm I lived in the

58

1  upper last call (Inaudible). Everyone files in a

2  line. Because I didn't want to wait in a line I

3  was waiting for last call and go at the end, so

4  besides that particular meal I wasn't going to

5  eat. I had prepared my meal in my bed area. I

6  was going to get some of my dessert.

7          **DEPUTY COMMISSIONER SMITH:** Okay

8  (Inaudible) copy here because we're certainly not

9  going to read through the (Inaudible) for 115.

10         **INMATE WALKER:** Okay.

11         **DEPUTY COMMISSIONER SMITH:** I just wanted

12  to have the record reflect the description that

13  you provided to Commissioner Davis was somewhat

14  different than the narrative on the 115.

15         **INMATE WALKER:** Okay.

16         **DEPUTY COMMISSIONER SMITH:** And that's not

17  unusual.

18         **INMATE WALKER:** Uh-huh.

19         **DEPUTY COMMISSIONER SMITH:** But I wanted

20  the record to reflect that. Commissioner, thank

21  you.

22         **PRESIDING COMMISSIONER DAVIS:** And you

23  were - so you were about to tell me about your

24  how you managed to stay out of gangs in here

25  (Inaudible)?

26         **INMATE WALKER:** Well, I knew that gangs -

27  my own lack of rationale, my own immaturity had

59

1  led me to this point; that led me to this

2  commitment offense, so I knew that in order to

3  stay out, to go home, I was going to have to make

4  a change and the only way to make that change was

5  to show some consistency and not get involved

6  with a gang.

7        PRESIDING COMMISSIONER DAVIS:  And now as

8  part of your coming to understanding that you

9  were talking about earlier?

10       INMATE WALKER:  Yes, I mean but I

11 (Inaudible) from day one.

12       PRESIDING COMMISSIONER DAVIS:  Uh-hmm.

13       INMATE WALKER:  In the County jail that in

14 order to change the person I was I still had to

15 get away from the gang and the only way to do

16 that was to be to myself and I figured over time

17 people would see oh this guy doesn't hang like

18 this.  He doesn't hang with these guys.  He

19 doesn't hang with those guys.

20       PRESIDING COMMISSIONER DAVIS:  Right.

21       INMATE WALKER:  Now, I've been asked about

22 the gang tattoos by gang guys in here and all

23 that and I tell them what it is, but I also tell

24 them that I'm no longer involved in that, you

25 know, and they can take it for whichever for

26 what's it worth.  However, in here people kind of

27 just observe.

60

1          PRESIDING COMMISSIONER DAVIS:  Yeah, you

2   just do it by example now?

3          INMATE WALKER:  By example.

4          PRESIDING COMMISSIONER DAVIS:  Okay, any

5   other questions?

6          DEPUTY COMMISSIONER SMITH:  No, I have no

7   other questions, but let me note that we sent out

8   Order Notice 3042 notices --

9          INMATE WALKER:  Yes.

10          DEPUTY COMMISSIONER SMITH:  Those are

11   letters that go out to the (Inaudible) Criminal

12   Justice Agencies that were involved in the

13   commitment offense.  We didn't receive any

14   responses to those notices.  However, Mr. Turley,

15   representing the Los Angeles District Attorney's

16   office is here and he's about to participate in

17   the hearing.

18          PRESIDING COMMISSIONER DAVIS:  Okay.  All

19   right, thank you.  Mr. Turley, just a few

20   questions please.  Could one inquire to where the

21   inmate went to high school?  What high school did

22   he go to?

23          DEPUTY DISTRICT ATTORNEY TURLEY:  What

24   high school did you go to, sir?

25          INMATE WALKER:  I went to Roosevelt High

26   School briefly.

27          DEPUTY DISTRICT ATTORNEY TURLEY:  And so

61

1   at the time that he was going to high school and

2   involved in the gang, he was living in basically,

3   East Los Angeles or Buena Heights?

4         **PRESIDING COMMISSIONER DAVIS:**  Is that

5   accurate?

6         **INMATE WALKER:**  Yes, sir.

7         **PRESIDING COMMISSIONER DAVIS:**  Okay, I'm

8   just interested in the geography of exactly where

9   this was in the County.  Has the inmate ever been

10  to Lynnwood?

11        **INMATE WALKER:**  Well, my uncle used to

12  live in Lynnwood in the early 1970's.  Other than

13  that I haven't been there since.

14        **PRESIDING COMMISSIONER DAVIS:**  You never

15  lived there?

16        **INMATE WALKER:**  No.

17        **DEPUTY COMMISSIONER SMITH:**  That's all.

18  Rutledge?

19        **ATTORNEY RUTLEDGE:**  Thank you.  Mr.

20  Walker, have you ever been house in an area with

21  other gang members?

22        **INMATE WALKER:**  Yes.

23        **ATTORNEY RUTLEDGE:**  With people I mean

24  from the Estrada Projects?

25        **INMATE WALKER:**  Once in VBI one time, one

26  guy.  Actually and this is the guy I knew his

27  parents and everybody and he asked me he said,

62

1  hey man, I told him, hey, I'm doing my own thing.

2  He said you're entitled to do what you want to do

3  and I mean he said just be consistent because

4  that's what usually gets people in trouble when

5  they're inconsistent.  You get (Inaudible) over

6  here then other gang members because there's

7  always someone watching.  Other gang members are

8  like, no, no, no, man, we seen you hanging out

9  with those guys, but we seen you with this.  No,

10  you're involved still, so that's one of the

11  things that I'm always conscious of (Inaudible)

12  around and my associations.

13      **ATTORNEY RUTLEDGE:**  Have you been attacked

14  by any other gang members while you've been here?

15      **INMATE WALKER:**  No, I have not.

16      **ATTORNEY RUTLEDGE:**  And have you ever done

17  a shoe-term at Pelican Bay?

18      **INMATE WALKER:**  Oh, no.

19      **ATTORNEY RUTLEDGE:**  All right and I note

20  your file - I just want to confirm this.  You

21  have skills as a cabinetmaker?

22      **INMATE WALKER:**  Yes, I've been a

23  cabinetmaker for the last 10 years.

24      **ATTORNEY RUTLEDGE:**  For PIA?

25      **INMATE WALKER:**  For PIA.

26      **ATTORNEY RUTLEDGE:**  All right and as a

27  butcher?

63

1          **INMATE WALKER:**  Yeah, I did some

2     butchering in DVI in '90, for about two years.

3     '90, '93 I think to '95.

4          **ATTORNEY RUTLEDGE:**  You know how to cut

5     meat up?

6          **INMATE WALKER:**  Yes, we were cutting a

7     rib-eye roll and certain other meats on the band,

8     so I knew how to, but I did a lot of – mainly I

9     did a lot of the clerical work for the a lot of

10    the invoices and moving stuff around the freezers

11    and unloading the trucks and preparing for the

12    main line and for the snack bar for the officers'

13    snacking.

14         **ATTORNEY RUTLEDGE:**  And do you have skills

15    as a clerk?

16         **INMATE WALKER:**  As a clerk, no.  No clerk

17    skills.

18         **ATTORNEY RUTLEDGE:**  No?  Well, you said

19    that you were doing a clerical skills?

20         **INMATE WALKER:**  Well, that was just the

21    invoice.  I didn't do any typing or anything like

22    that.  It was just the invoice of what comes off

23    the truck; documenting it.

24         **ATTORNEY RUTLEDGE:**  Kind of inventory --

25         **INMATE WALKER:**  Inventory.

26         **ATTORNEY RUTLEDGE:**  -- and stuff?  What

27    about watch repair?

64

1        INMATE WALKER:  Yes, I'm a certified watch

2   repairman.

3        ATTORNEY RUTLEDGE:  All right and when - I

4   saw furniture maker does that cover the cabinet?

5        INMATE WALKER:  Yes.

6        INMATE WALKER:  Yes, yes we built all this

7   stuff in this room and areas, as well as other

8   things.

9        ATTORNEY RUTLEDGE:  No further questions.

10        PRESIDING COMMISSIONER DAVIS:  All right,

11   thank you.  Mr. Turley closing.

12        DEPUTY DISTRICT ATTORNEY TURLEY:  Thank

13   you.  I was impressed with the work that the

14   inmate did with young people in those three years

15   when had an opportunity to do that and as he

16   suggested I suspected he learned at least as much

17   from it as the young people did and on my part I

18   would hope that he would continue to pursue

19   opportunities to do that for both his own benefit

20   and for the benefit of others.  I'm aware of the

21   fact that sometimes even in this facility those

22   opportunities are available and when he gets out

23   I hope he'll continue to do that as well.  If he

24   does indeed end up living in Lynwood, there won't

25   be any shortage of young people there who need

26   his help.  Roosevelt High School is in a

27   difficult neighborhood, but at the same time and

65

1   I am sure the inmate would agree with this that

2   there a lot of people there.  Now, acquaintances

3   of mine, friends of mine who did indeed manage to

4   go through there and did indeed to manage to stay

5   free from gangs, and did indeed make successful

6   lives for themselves without being involved in

7   crimes.  This can be a tough area, but one of my

8   best friend's at the D.A., but is an alumnus of

9   that school and I have many other friends in well

10  known area of Los Angeles and the area has

11  allowed cultural pride in high school.  So and

12  would indeed encourage the inmate to look for

13  opportunities to continue to help others and to

14  caution him that if indeed he does move to

15  Lynnwood that that's a difficult area right now.

16  More difficult - Lynnwood right now is probably

17  more difficult than Roosevelt was in 1970's and

18  so he's going to have to work hard to stay away

19  from criminals, criminal environments and gang

20  activity.  Unfortunately, the inmate did choose

21  to participate in a criminal lifestyle.  He has

22  an unfortunate history of crimes.  At the time

23  that he pleaded guilty to this offense he also

24  pleaded guilty to residential burglary, which he

25  had committed just a few months before this

26  instant offense occurred.  Unfortunately, for

27  those of us in this room we are all too familiar

66

1  with the violence that gangs perpetuate and I use

2  that word advisably perpetuate.  It goes on and

3  on and on, and here in an unprovoked situation

4  some unfortunate people who were stranded,

5  attacked.  The investigating officer referred to

6  the inmate as the instigator of the attack.  He

7  WAS said to have been the oldest of the crew

8  there and they chose to participate in just a

9  thrashing and beating of a group of people who

10  were being overwhelmed and as a result of that

11  one of those person's was stabbed 12 times and

12  was dead, and other people were hurt, injured,

13  could have been killed as well.  The inmate --

14  some of his fellow gang members could have been

15  killed or injured.  He could have been killed or

16  injured.  That type of violence is unacceptable.

17  I appreciate the efforts he's made to gain

18  insight into that and would encourage him to

19  continue in that pursuit and to understand the

20  full nature and the result of the criminal

21  lifestyle that he chose and would hope that he

22  would pursue those plans, but at this time I am

23  granting him the denial.

24      **PRESIDING COMMISSIONER DAVIS:**  Thank you.

25      **DEPUTY COMMISSIONER SMITH:**  Ms. Rutledge.

26      **ATTORNEY RUTLEDGE:**  Mr. Walker reminds of

27  the man who wrote the song "Amazing Grace,"

67

1  although his name slips my mind, but he was a

2  former slave trader and he was very active in the

3  abuse of human beings and later on in his life

4  and much later I guess back then it would be

5  about Mr. Walker's age, maybe late 30's, 40's, he

6  turned his life around and he for him it was a

7  religious change, but he went on to write

8  "Amazing Grace" and did a lot of good for the

9  community, and it's always hard to understand for

10  me having not ever participated in beating

11  somebody up and this crime is everybody's

12  nightmare.  When I lived in L.A., I was afraid of

13  breaking down and I had to go through East L.A.,

14  sometimes and I was afraid of this very

15  situation, and sitting here today it's

16  interesting in the way that I think - - I wonder

17  about that and I think about other people in

18  history that have done, committed these type of

19  sins, but were able to change and become

20  productive members of society.  And, frankly,

21  that's already happened with Mr. Walker.  He's

22  already been giving of himself to other kids and

23  he's had to further - - I think the Panel covered

24  everything.  I would just note that he has not

25  been in a fight or in a physical type of thing

26  since 1983.  That was 20, almost 23 years ago.

27  It's been almost 9 years since he had a rules

68

1  violation in '97, but prior to that I think it

2  was sometime - -

3      **INMATE WALKER:**  At least '80, '87; '88 I

4  believe it was.

5      **ATTORNEY RUTLEDGE:**  So, he has went 9

6  years and then he's gone an additional 9 years.

7  He, as he tells the Panel, he turned his life

8  around in 1989, which was 17 years ago and that's

9  the majority of the time that he's been

10  incarcerated.  He has multiple skills, support,

11  everything we could want.  You know, in summary

12  that we are going to re-release him to society

13  and what I would propose to the Panel is when we

14  release Mr. Walker if we're letting one criminal

15  out and preventing probably hundreds from coming

16  in because he could very well go back to his

17  neighborhood and work with the kids over there or

18  whatever.  There are lots of projects that need

19  someone to help out, so I think by letting him

20  come back to the -- go back to the community we

21  would actually be preventing other people from

22  coming into prison and I think that's quite a

23  change in the person that he is today, so I would

24  ask that the Panel give him a date.

25      **PRESIDING COMMISSIONER DAVIS:**  Thank you.

26  Mr. Walker, now's your opportunity to address the

27  Panel directly and tell us why you believe that

69

1    you're suitable for parole?

2         **INMATE WALKER**:  Well, because I believe

3    that over the years I'm probably the type of

4    person -- well, I believe I'm the type of person

5    that you're looking for to parole.  I mean I came

6    in and had a rocky time; however, over the years

7    I've constantly improved myself and my

8    understanding and tried to demonstrate it and

9    have it documented as well of the changes that

10   I've made and that is my goal to get out and

11   contribute to whatever community I'm in because I

12   understand the severity of the crime I was here

13   for and I understand the loss of life (Inaudible)

14   Garcia's life and I wouldn't want anybody to go

15   through that.  It took me awhile.  I didn't have

16   the rationale as a kid to be able to understand,

17   but believe me I understand.  I mean I draw a lot

18   of parallels between what happened to him and his

19   family and what happened in my family when my

20   brother was killed and I used that as motivation

21   to make sure that not only do I ever get involved

22   in anything, but anybody around me who's an

23   earshot doesn't get involved because that's my

24   goal.  Matter of fact, I live my life by that by

25   making sure that anyone who was willing to listen

26   or in an earshot does not go down that road.  I

27   want everyone and I need you to understand this

70

1  that I am a changed person and I have something

2  to give and I'm eagerly looking forward to

3  getting out on parole and offering my services to

4  the community, to the churches or whatever.  I'm

5  not a complete package.  I am a work-in-progress.

6  I am going to continue to learn and continue to

7  improve myself, you know, and hopefully this

8  Panel will see that and find me suitable, but, if

9  not, hopefully next year or the year after

10  whenever they say to come back they'll see it

11  then because I'll be just as consistent, I'll be

12  a lot wiser and a lot more mature and I'll have a

13  lot more to offer as well then.  Thank you.

14      **PRESIDING COMMISSIONER DAVIS:**  Thank you

15  very.  We'll now recess for deliberation.

16                **R E C E S S**

17                  -oOo-

18      **PRESIDING COMMISSIONER DAVIS:**  And if you

19  sign the letter, Mr. Walker, just feel free to

20  ask one of the officers to bring it in.

21      **INMATE WALKER:**  Okay.

22          (Side One Ends)

23      **DEPUTY COMMISSIONER SMITH:**  We're here

24  just a moment without the presence of Mr. Walker

25  or counsel only because I want to note for the

26  record a current letter that was presented to the

27  Panel during recess by Mr. Walker from his

1    mother, Mattie Walker.  It's dated May 17th,

2    2006.  It is, once again, a positive letter

3    requesting that he be considered for parole at

4    this hearing.  She, again, indicates that she

5    will provide him with residence, that she will in

6    addition to the other letter she will provide him

7    with a car so that he (Inaudible) transportation

8    and she will assist in the whatever possible

9    manner to help him obtain employment and

10    indicated she has, once again, written an

11    extremely positive letter.  Another letter was

12    also provided from a Herman Avilez, A-V-I-L-E-Z,

13    Program Coordinator with the City of Los Angeles

14    Youth Opportunity Movement; however, I'm not

15    going to address that letter as it's dated August

16    2, 2004, and would have been received or should

17    have been received prior to Mr. Walker's last

18    hearing, which was held January 3rd of 2005, and

19    with that I'll go back off the record until we

20    resume with all participants.

21                    **R E C E S S**

22                    -oOo-

23

24

25

72

1               CALIFORNIA BOARD OF PAROLE HEARINGS

2                      D E C I S I O N

3          DEPUTY COMMISSIONER SMITH:  We're back on

4    the record.  Everyone previously identified is

5    back in the hearing room.  Mr. Walker I noted for

6    the record and you'll see it when you get your

7    copy of the transcript is that I noted for the

8    record the most current letter from your mother

9    and provided a summary overview of what she

10   included in her letter and I appreciate you

11   finding that for me and getting it into us.

12   Additionally, the letter from the City of Los

13   Angeles was dated prior to your last hearing, so

14   I made the assumption as I sometimes will do that

15   that was a letter that was received prior to the

16   last hearing and was addressed and so I didn't

17   readdress it.  Now, I noted the fact of when it

18   came in and what the date was.

19          INMATE WALKER:  Yes, sir.

20          DEPUTY COMMISSIONER SMITH:  But that I

21   didn't address it for the record.

22          INMATE WALKER:  Yes and I was just

23   bringing that forward to the -- for what the

24   D.A.'s representative said about getting active

25   in the community.  That was my letter.  One of

26   the gentlemen that I'm trying to get involved

27   **EUGENE WALKER   C-55991   DECISION PAGE 1 7/13/06**

73

1    with.

2         **DEPUTY COMMISSIONER SMITH:**  Right and I

3    realize that now.  When I read both letters and

4    put them on the record is was only Commissioner

5    Davis and I in the room.

6         **INMATE WALKER:**  Okay.

7         **DEPUTY COMMISSIONER SMITH:**  And I noted

8    that on the record, too.  But I wanted to bring

9    you completely up-to-speed.  I've also advised

10   your counsel as to what --

11        **ATTORNEY RUTLEDGE:**  Ms. Rutledge.

12        **DEPUTY COMMISSIONER SMITH:**  -- what he did

13   with those letters.  (Inaudible)  And that put

14   her on the record, so that we're on level playing

15   field.

16        **PRESIDING COMMISSIONER DAVIS:**  Okay, thank

17   you.  All right (Inaudible) this is a matter of

18   Eugene Walker, CDC number C-55991.  The panel

19   reviewed all information received (Inaudible)

20   circumstances in concluding that the prisoner is

21   not suitable for parole and would pose an

22   unreasonable risk and danger to society or such

23   public safety if released from prison.  First and

24   foremost is the commitment offense.  There were

25   multiple victims that were attacked, injured and

26   one was killed in a single incident.  The offense

27   **EUGENE WALKER   C-55991   DECISION PAGE 2 7/13/06**

1    was carried out in a matter which demonstrates an

2    exceptional callous disregard for human suffering

3    and the motive for the crime was very trivial in

4    relation to the defense.

5         **DEPUTY COMMISSIONER SMITH:**  These

6    conclusions are drawn from the statement of facts

7    (Inaudible) prisoner, together with his

8    associates convicted in (Inaudible) and took

9    advantage of victims who's car broke down to

10   beat, shoot at, stab and rob the victims.   The

11   victim -- one victim was stabbed approximately 12

12   times, at least 2 of those wounds were fatal.   We

13   do find that there is (Inaudible) criminal

14   conduct in violence and failed to failure to

15   (Inaudible) society.   That's the correct

16   criminology specifically, juvenile probation.

17   With regard to conduct while incarcerated we find

18   that there are 18, 128A (Inaudible) chronos left

19   of which were before 1996 and 12, serious 115

20   disciplinary reports, the last of which was in 12

21   of 1997.   The psychological report in July of

22   2004, by Dr. Mcomber, is supported and I note

23   that I appreciate counsel bringing to our

24   attention the section of the or actually

25   reemphasizing for us the section where you were

26   involved with the youth as I thought that - - I

27   **EUGENE WALKER   C-55991   DECISION PAGE 3 7/13/06**

75

 1  can understand why the doctor was impressed with

 2  your passion for that program because I, too, was

 3  impressed with what I sense was a real emotion

 4  and a sincere commitment on your part to do that

 5  kind of work, so I appreciate that.  In regard to

 6  parole plans we note that you have a viable

 7  residence with your mother and that you certainly

 8  have a variety of skills and vocations and a job

 9  offer and not a reason for denial, but simply a

10  suggestion for further for future reference that

11  additional specificity would be helpful with

12  regard to hours and salary of any position that

13  you're being offered.  And we also note that you

14  had many letters of support from family and

15  friends.  With regard to the 3042 notices, we

16  note the District Attorney from Los Angeles

17  County is here in person by representative and

18  does oppose parole.  Nevertheless, we do want to

19  commend you for many things.  First, I wish

20  (Inaudible) 2006 Anger Management Course, the

21  2006 Inmate Employability Program.  There are

22  three of those in that series.  The 2006, the

23  Healing Be Angry Heart; 2005,Anger Management;

24  and your work at a PIA furniture assembly with --

25  was above average to exception work reports.

26  However, these positive aspects do not outweigh

27  **EUGENE WALKER  C-55991  DECISION PAGE 4 7/13/06**

76

1    the factors for unsuitability.  This is a one-

2    year denial.  The Panel accordingly recommends

3    that you remain (Inaudible) free and that as

4    available you continue to participate in self-

5    help programs and I would add to that continue to

6    work with others.  I think that (Inaudible)

7    always helpful as well.  And then that you earn

8    positive chronos and the Panel will be ordering

9    or will be requesting a new psychological

10   evaluation prior to the next hearing.

11   Commissioner, do you have any comments?

12        **PRESIDING COMMISSIONER DAVIS**:  Yeah, a

13   couple of comments and it's recommendation and

14   regarding the validation?

15        **INMATE WALKER**:  No.

16        **DEPUTY COMMISSIONER SMITH**:  The fact that

17   you're still validated is not a reason for denial

18   as well, but if you haven't been asked that

19   question the past hearing you might very well be

20   asked that question in the next hearing.  My

21   suggestion would be is that you ask your

22   counselor if there's anyone that you can talk

23   with about getting that cleared.

24        **INMATE WALKER**:  I will --

25        **DEPUTY COMMISSIONER SMITH**:  Okay.

26        **INMATE WALKER**:  -- do that.

27   **EUGENE WALKER  C-55991  DECISION PAGE 5 7/13/06**

77

1       **DEPUTY COMMISSIONER SMITH:** Even if you

2   can't --I mean because I don't know how the

3   institution's work, so I can't advise you that

4   way, but even if you can't and you ask the

5   question at your next hearing if it comes up you

6   can say I'm not involved, I have not been

7   involved and I asked my counselor at this time to

8   help me get that cleared up and this is what

9   happened.

10      **INMATE WALKER:** I will.

11      **DEPUTY COMMISSIONER SMITH:** So, it's a

12  positive step.  Clearly, you are taking many

13  positive steps.

14      **INMATE WALKER:** Yes, sir.

15      **DEPUTY COMMISSIONER SMITH:** And without

16  any question of my mind you're absolutely moving

17  in the right direction.

18      **INMATE WALKER:** Okay.

19      **DEPUTY COMMISSIONER SMITH:** As we often

20  comment, you know, even though the verbiage is

21  that we grant a parole date the reality is we

22  don't.  The inmate earns that date.

23      **INMATE WALKER:** Yes, sir.

24      **DEPUTY COMMISSIONER SMITH:** And you've

25  gone a long way already to earning that date, so

26  continue on.

27  **EUGENE WALKER  C-55991  DECISION PAGE 6 7/13/06**

78

1          **INMATE WALKER:**  I will.

2          **PRESIDING COMMISSIONER DAVIS:**  Well, all

3    I'm going to say mine is I very much appreciate

4    the way your clothing comments also the way you

5    sit because you're also reading my mind because I

6    was wondering about this from the (Inaudible).

7    You said no matter what happens I'm going to

8    continue to grow and do better.

9          **INMATE WALKER:**  Yes, I am.

10         **PRESIDING COMMISSIONER DAVIS:**  I think

11   that's a very, very mature and very important

12   thing for you to do.

13         **INMATE WALKER:**  Thank you and I will.

14         **PRESIDING COMMISSIONER DAVIS:**  All right.

15         **DEPUTY COMMISSIONER SMITH:**  Yeah,

16   certainly without any question you present

17   yourself in a very, very positive way.  Thank

18   you.

19         **PRESIDING COMMISSIONER DAVIS:**  All right,

20   Mr. Walker, sincerely best of luck.

21         **INMATE WALKER:**  Okay, thank you.

22         **PRESIDING COMMISSIONER DAVIS:**  We are

23   adjourned.

24         **INMATE WALKER:**  Thank you both.  Have a

25   nice day.

26         **DEPUTY COMMISSIONER SMITH:**  Good luck,

27   **EUGENE WALKER   C-55991   DECISION PAGE 7 7/13/06**

79

1    sir.  Ms. Rutledge, thank you.

2         **ATTORNEY RUTLEDGE:**  Oh, you're welcome.

3         **DEPUTY COMMISSIONER SMITH:**  We have made a

4    (Inaudible) Mr. Turley, thank you (Inaudible).

5              **A D J O U R N M E N T**

6                    --o0o--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   **PAROLE DENIED ONE YEAR.**              NOV 1 0 2006

24   **THIS DECISION WILL BE FINAL ON:**_____

25   **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED.**

27   **EUGENE WALKER  C-55991  DECISION PAGE 8 7/13/06**

80

CERTIFICATE AND
DECLARATION OF TRANSCRIBER


I, STEPHANIE STROTHERS, a duly designated

transcriber, NORTHERN CALIFORNIA COURT REPORTERS,

do hereby declare and certify under penalty of

perjury that I have transcribed tape(s) which

total one in number and cover a total of pages

numbered 1 - 79, and which recording was duly

recorded at PLEASANT VALLEY STATE PRISON,

COALINGA, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING OF

EUGENE WALKER, CDC NO. C-55991, on July 13, 2006,

and that the foregoing pages constitute a true,

complete, and accurate transcription of the

aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated October 1, 2006, at Folsom,

California.

_Stephanie Strothers_

————————————————————————————————
STEPHANIE STROTHERS, TRANSCRIBER
**NORTHERN CALIFORNIA COURT REPORTERS**

# EXHIBIT 9

# *SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES*

**DEPT 100**

| Date: | August 24, 2007 | | | |
|---|---|---|---|---|
| Honorable: | PETER ESPINOZA | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

<table>
<tr><td rowspan="2">BH004478<br>In re,<br>EUGENE WALKER,<br>Petitioner,<br>On Habeas Corpus</td><td colspan="2">(Parties and Counsel checked if present)</td></tr>
<tr><td>Counsel for Petitioner:<br><br>Counsel for Respondent:</td></tr>
</table>

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

The Court has read and considered Petition for Writ of Habeas Corpus filed on February 5, 2007. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that Petitioner is unsuitable for release on parole. See Cal. Code Reg. tit., 15, § 2402; *In re Rosenkrantz* (2002) 29 Cal. 4th 616, 667.

Petitioner was received in the Department of Corrections on November 9, 1982, after a conviction for second degree murder. He was sentenced to fifteen years to life imprisonment. His minimum parole eligibility date was July 22, 1990. The record reflects that on November 26, 1981, Petitioner and fellow gang members robbed four victims, who were stranded when their car ran out of gas. During the course of the robbery, the victims were beaten and stabbed. One of the victims died as a result of multiple stab wounds.

The Board found Petitioner unsuitable for parole after a parole consideration hearing held on July 13, 2006. Petitioner was denied parole for one year. The Board concluded that Petitioner was unsuitable for release on parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on several factors including the circumstances of the commitment offense, Petitioner's juvenile record and several disciplinary reports.

The Court finds that there is some evidence to support the Board's finding that Petitioner's commitment offense involved multiple victims being attacked, injured or killed, the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering, and the motive for the crime was trivial in relation to the offense. Cal. Code Regs., tit. 15, § 2402(c)(1)(A), (c)(1)(D) and (c)(1)(E). The record reflects that the four victims were stranded when their car ran out of gas. Petitioner and his crime partners, who were fellow gang members, took advantage of the victims' unfortunate situation by robbing, beating and stabbing the victims. One victim surrendered his wallet containing $200. While fleeing the scene, the victim heard gunshots directed toward him. He received a superficial abrasion to his abdomen. Another victim surrendered his wallet containing $180 and a watch. He was stabbed in the back. In addition, he received treatment for lacerations to his face, abdomen and extremities. A third victim surrendered his wallet containing $80. He was struck in the face with a stick. He was then beaten and kicked. He was treated for a broke nose, multiple contusions to his face and a sprained ankle. The fourth victim was stabbed twelve times in the chest, which resulted in his death.

1

| Minutes Entered |
|---|
| 08-24-07 |
| County Clerk |

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | August 24, 2007 | | | |
|-------|-----------------|--|--|--|
| Honorable: | PETER ESPINOZA | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004478
In re,
EUGENE WALKER,
      Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

     The Board further noted that Petitioner had failed to profit from society's previous attempts to correct his criminality. The Board based this finding on the fact that as a juvenile, Petitioner was arrested on separate occasions for receiving stolen property and two burglaries. During one of the burglaries, Petitioner and fellow gang members accosted a 14-year old victim and stole his bicycle. Thus, the record contains some evidence that Petitioner was undeterred by earlier attempts to correct his criminal conduct.

     The Board noted that Petitioner has received several disciplinary reports while incarcerated for the commitment offense. The Board did, however, acknowledge that the last disciplinary report was received in 1997.

     In making its decision, the Board considered factors tending to show Petitioner's suitability for release on parole. Petitioner has realistic parole plans in that he has a place to live upon his release and an offer of employment. Petitioner has gained a variety of skills and vocations. Petitioner has participated in self-help programs. Petitioner has participated in *Straight Life*, a program that helps delinquent youth. The record reflects that the Board considered Petitioner's post conviction gains but still concluded that Petitioner would pose an unreasonable risk of danger and a threat to public safety.

     Finally, the Court rejects Petitioner's argument that he is being held in violation of his plea agreement. Petitioner pleaded guilty to a second degree murder and received an indeterminate life term. Such sentences are, in legal effect, a sentence for the maximum term unless the parole authority acts to fix a shorter term. See *In re Dannenberg* (2005) 34 Cal.4[th] 1061, 1097-98.

     The Court finds that there is "some evidence" to support the determination that Petitioner presents an unreasonable risk of danger to society and is therefore not suitable for release on parole.

     Accordingly, the petition is denied.

     The court order is signed and filed this date. The clerk is directed to give notice.

     A true copy of this minute order is sent via U.S. Mail to the following parties:

2

| Minutes Entered |
|-----------------|
| 08-24-07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| | | | | |
|---|---|---|---|---|
| Date: | August 24, 2007 | | | |
| Honorable: | PETER ESPINOZA | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004478
In re,
EUGENE WALKER,
                    Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

Eugene Walker
C-55991
Correctional Training Facility
P.O. Box 689
Soledad, California 93960

Department of Justice
Office of the Attorney General of the State of
California
110 West A. Street, Suite 1100
San Diego, California 92101
Attn: Ms. Cynthia Lumely



THE DOCUMENT TO WHICH THIS CERTIFICATE IS ATTACHED IS A FULL, TRUE
AND CORRECT COPY OF THE ORIGINAL ON FILE AND OF RECORD IN MY OFFICE.
AND A CLERK, EXECUTIVE OFFICER/CLERK OF THE SUPERIOR COURT OF
THE STATE OF CALIFORNIA FOR THE COUNTY OF LOS ANGELES.

ATTEST: August 29/07 BY: _Joseph M. Pulido_ DEPUTY

JOSEPH M. PULIDO, S.C.C.

233319

3

| Minutes Entered |
|---|
| 08-24-07 |
| County Clerk |

# EXHIBIT 10

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT    **COURT OF APPEAL - SECOND DIST.**

DIVISION FOUR

F I L E D

DEC 21 2007

JOSEPH A. LANE        Clerk

Deputy Clerk

| | | |
|---|---|---|
| In re | ) | B 202525 |
| | ) | |
| EUGENE WALKER, | ) | (Super. Ct. No. A374018, BH004478) |
| | ) | (Peter Espinoza, Judge) |
| on Habeas Corpus. | ) | |
| | ) | ORDER |
| | ) | |
| | ) | |

THE COURT:*

The petition for writ of habeas corpus has been read and considered.

The petition is denied for failure to state sufficient facts or to provide an adequate record or legal authority demonstrating entitlement to the relief requested.  There is "some evidence" to support the findings of the Board of Parole Hearings.  (See *In re Dannenberg* (2005) 34 Cal.4th 1061, 1071.)

\* EPSTEIN, P.J.,        WILLHITE, J.,        MANELLA, J.

# EXHIBIT 11

Court of Appeal, Second Appellate District, Div. 4 - No. B202525
**S159512**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re EUGENE WALKER on Habeas Corpus

The petition for review is denied.

SUPREME COURT
**FILED**

MAR 1 2 2008

Frederick K. Ohlrich Clerk

_____
Deputy

Moreno, J., was absent and did not participate.

_____
GEORGE
Chief Justice

E-Filing, HABEAS, ProSe

## U.S. District Court
## California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:07-cv-00644-MMC
## Internal Use Only

Walker v. Curry
Assigned to: Hon. Maxine M. Chesney
Cause: 28:2254 Petition for Writ of Habeas Corpus (State)

Date Filed: 01/31/2007
Jury Demand: None
Nature of Suit: 530 Habeas Corpus (General)
Jurisdiction: Federal Question

**Petitioner**

**Eugene Walker**

represented by **Eugene Walker**
Correctional Training Facility
Prisoner Id C-55991
P.O. Box 689
Soledad, CA 93960
PRO SE

V.

**Respondent**

**Ben Curry**

represented by **Denise Alayne Yates**
Office of the Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
415-703-5531
Fax: 415-703-5843
Email: denise.yates@doj.ca.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/31/2007 | 1 | PETITION for Writ of Habeas Corpus; no process (Filing fee: receipt no. no. 34611002398). Filed by Eugene Walker. (slh, COURT STAFF) (Filed on 1/31/2007) (Entered: 01/31/2007) |
| 05/11/2007 | 2 | ORDER RE ELECTRONIC FILING IN CASES WITH UNREPRESENTED PARTIES: Case designated for electronic filing. Effective immediately all represented parties will e-file their submissions to the court. Represented parties will be required to serve paper copies by mail on unrepresented parties. Unrepresented litigants will continue to file and serve all submissions to the court in paper form unless prior leave is obtained from the assigned judge. Signed by Chief Judge Vaughn Walker dated 5/11/07. Copy mailed to counsel of record. (slh, COURT STAFF) (Filed on 5/11/2007) (Entered: 05/18/2007) |
| 07/24/2007 | 3 | ORDER TO SHOW CAUSE by Judge Martin J. Jenkins re why a writ of habeas corpus should not be granted; copy of order and petition served upon respondent and CA State Attorney General via certified mail. (slh, COURT STAFF) (Filed on 7/24/2007) Additional attachment(s) added on 8/31/2007 (epb, COURT STAFF). (Entered: 07/27/2007) |
| 10/18/2007 | 4 | Response to Order to Show Cause *Respondent's Answer to the Order to Show Cause; Supporting Memorandum of Points and Authorities* byBen Curry. (Attachments: # 1 Exhibit 1# 2 Exhibit 2 part 1 of 2# 3 Exhibit 2 part 2 of 2# 4 Exhibit 3 and 4# 5 Exhibit 5# 6 Exhibit 6 |

| | | and 7# <u>7</u> Exhibit 8-10# <u>8</u> Exhibit 11 part 1 of 2# <u>9</u> Exhibit 11 part 2 of 2# <u>10</u> Exhibit 12# <u>11</u> Exhibit 13# <u>12</u> Exhibit 14# <u>13</u> Exhibit 15 part 1of 2# <u>14</u> Exhibit 15 part 2 of 2# <u>15</u> Exhibit 16) (Yates, Denise) (Filed on 10/18/2007) (Entered: 10/18/2007) |
| 11/28/2007 | 5 | Traverse; Memorandum of Points and Authorities filed by Eugene Walker. (slh, COURT STAFF) (Filed on 11/28/2007) (Entered: 12/10/2007) |
| 04/07/2008 | 6 | ORDER REASSIGNING CASE. Case reassigned to Judge Hon. Maxine M. Chesney for all further proceedings. Judge Hon. Martin J. Jenkins no longer assigned to case. (sv, COURT STAFF) (Filed on 4/7/2008) (Entered: 04/08/2008) |

Eugene A. Walker, C-55991
Correctional Training Facility
P.O. Box 589
Soledad, CA 93960

Petitioner in pro se


Clerk of the Court
United States District Court
Northern District of California
450 Golden Gate Ave.
San Francisco, CA 94102


RE: FILING WRIT OF HABEAS CORPUS

Clerk of the Court:

    Please find enclosed the original of my writ of habeas corpus. Because of writs being delayed, even lost by the prison trust office, I respectfully request that you bill me for the filing fee and I will make arrangements for payment from a family member.  Thank you.

    Also, please be advised, for tracking purposes, that I currently have a habeas petition pending before the Honorable Maxine M. Chesney.

    Thank you for your time and consideration in my request to be billed.

Respectfully,

Eugene A. Walker
Petitioner in pro se

Eugene Walker, C-55551
CTF-EastDorm (ED-135C)
P.O. Box 689
Soledad, CA 93960

LEGAL MAIL

PRIORITY MAIL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT of California
450 Golden Gate Ave.
San Francisco, CA 94102



RECE

MAY 1

RICHARD